Peter WRIGHT and Beneficial Standard Corporation, Plaintiffs,

v.

The HEIZER CORPORATION and International Digisonics Corporation, Defendants.

No. 72 C 2536.

United States District Court, N. D. Illinois, E. D.

Oct. 3, 1980.

As Modified Oct. 28, 1980.

Edward Slovick, and James S. Gordon, J. Samuel Tenenbaum, and Theodore M. Becker, Becker & Tenenbaum, Chicago, Ill., for plaintiffs.

Max E. Wildman, Wildman, Harrold, Allen & Dixon, William A. Montgomery, Allen Horwich, and John Adams, Schiff, Hardin & Waite, Chicago, Ill., for defendant Heizer Corp.

Harold A. Lipton, Kaplan, Livingston, Goodwin, Berkovitz & Selvin, Beverly Hills,

Cal., John B. Simon, and Russ M. Strobel, Friedman & Koven, Chicago, Ill., for defendant International Digisonics Corp.

## MEMORANDUM DECISION

MARSHALL, District Judge.

We have four issues to resolve in this shareholder derivative suit brought on behalf of International Digisonics Corporation (IDC) against defendant Heizer Corporation (Heizer). Plaintiffs alleged that Heizer defrauded IDC in a series of five transactions in which Heizer purchased IDC preferred stock and made loans in exchange for both demand notes and stock warrants. After we rendered our decision, 411 F.Supp. 23 (D.C.Ill.), the Court of Appeals affirmed in part and vacated in part, with directions to modify. *Wright v. Heizer Corp.*, 560 F.2d 236 (7th Cir. 1977). The issues now awaiting resolution are (1) the adjustment of the maturities of the demand notes held by Heizer, (2) the amount of attorney's fees, if any, to be awarded to plaintiffs, (3) whether those fees should be assessed against Heizer and (4) whether IDC should be compelled to redeem the preferred stock held by Heizer.

## FACTS

The facts underlying plaintiffs' complaint were set forth in great detail in our original memorandum decision and in the Court of Appeals decision. Thus we will limit our description of the facts to those necessary to provide an understanding of the remaining issues.

In a series of five transactions beginning in November, 1969, Heizer invested in IDC through the purchase of IDC preferred stock and the exchange of demand loans in return for stock warrants. In the first transaction, in November, 1969, Heizer purchased 100,000 shares of newly created Class A common stock at $10 per share. In addition, IDC gave Heizer a warrant to purchase 155,000 shares of IDC common stock at $8.50 per share. The warrant contained an antidilution clause which reduced the price to Heizer in the event IDC issued or sold common stock at less than $8.50. Heizer agreed to lend IDC up to $500,000 with interest at 2% over prime. This $500,000 sum was loaned to IDC in May, 1970.

In September, 1970, IDC and Heizer consummated the second transaction. IDC amended its certificate of incorporation to authorize 350,000 shares of a new class of preferred stock, carrying a weighted vote of 4.4 votes per share on all shareholder votes. Heizer exchanged the 100,000 shares of Class A common issued in the first transaction for 100,000 shares of the new preferred and purchased 200,000 additional shares at $10 per share in two takedowns of $1,000,000 each. After the second takedown, IDC issued an additional warrant to purchase 400,000 shares of IDC common at $6 per share, with an antidilution clause identical to the one employed in the first transaction.

The third transaction occurred in May, 1971. IDC amended its certificate of incorporation to increase the authorized common stock to 3,000,000 shares. IDC sold Heizer a twenty-year senior note in the principal amount of $1.7 million and issued additional warrants to purchase 472,222 shares of IDC common at $3.60 per share. The purchase price in the warrants issued in the first two transactions was adjusted to $3.60 per share and the number of shares purchasable under the warrants was increased to 276,223 for the first transaction and 555,555 for the second transaction. Thus by the conclusion of the third transaction Heizer could purchase 1,304,000 shares of common stock at $3.60 per share.

The fourth transaction, consummated in November, 1971, provided for loans of up to $600,000 by Heizer to IDC through sale of a note by IDC to Heizer payable on demand after March 31, 1972. If the entire $600,000 was loaned but not timely paid, Heizer could convert it into common stock at $1.00 per share. If the note became convertible, then the prices on the warrants from the first three transactions would be decreased from $3.60 per share to $1.00 per share and the number of shares purchasable would increase from 1,304,000 to 4,694,400. IDC amended its certificate of incorporation in-

creasing the number of authorized common shares from 3,000,000 to 7,000,000.

On March 13, 1972, the November, 1971 agreement was amended to provide for an additional loan from Heizer to IDC of an amount up to $250,000. On March 13, Heizer loaned $105,000 of this amount to IDC. In addition, IDC issued a demand note in the amount of $114,508 to cover management services Heizer had performed for IDC. IDC was unable to repay any of the fourth transaction loans by March 31, 1972 and thus all warrants held by Heizer became exercisable at $1.00 per share. This gave Heizer the right to purchase 5,513,000 shares of IDC common stock, representing 87% of IDC's pro forma common stock equity. Between April 14, 1972 and April 19, 1973, Heizer loaned IDC an additional $2,015,000 in demand loans.

On October 11, 1972 the plaintiffs brought this action seeking to enjoin Heizer's exercise of the stock warrants and to obtain rescission of the first four transactions. Then on June 8, 1973, in the fifth transaction, Heizer agreed to refrain from demanding payment on the notes totalling $819,508 issued pursuant to the fourth transaction and demand notes totalling $2,015,000 issued between April 14, 1972 and April 19, 1973. In addition, Heizer agreed to make further demand loans to IDC in the maximum amount of $1,181,700 and a minimum of $460,400. IDC pledged all of the stock of its wholly owned subsidiary Talent and Residuals, Inc. (TR) to Heizer as security for the demand note loans made after April 14, 1972. Plaintiffs amended their complaint to challenge the fifth transaction as well as the first four.

In our memorandum decision of December 3, 1975, following a bench trial, we held that plaintiffs, as shareholders of IDC, could maintain the action derivatively on behalf of IDC, but not on their own behalf. We then held that plaintiffs had not proved a 10b–5 violation with respect to the first three transactions. We concluded that although Heizer had driven a hard bargain, IDC was badly in need of cash, and IDC's directors, counsel, and shareholders had been fully informed and that the directors were independent of Heizer's control.

We held, however, that Heizer had violated Rule 10b–5 in the fourth and fifth transactions. Because by the fourth transaction Heizer's agents were on IDC's board and held votes essential to the consummation of these transactions, we held that Heizer had a heavy burden of proving the fairness of these transactions. We noted that in the fourth transaction, Heizer, for an additional investment of only $600,000, had increased its claim on IDC's common equity from 1,304,000 shares at $3.60 per share to 4,694,000 (and after additional demand loans 5,513,000) shares at $1.00 per share. We also found that Heizer's valuation of IDC stock at $1.00 per share was inadequate and that Heizer had dealt unfairly with IDC. We held that the fifth transaction was also unfair. After the fourth transaction, Heizer could, through the warrants and convertible notes, capture 87% of IDC's equity and the profitable TR. Thus Heizer, by obtaining the pledge of TR stock in the fifth transaction, was attempting to protect itself from the outcome of this litigation. We noted that "[i]t is difficult to conjure a more blatant breach of trust." *Wright v. Heizer Corp.*, 411 F.Supp. at 37.

We ordered the notes from the fourth and fifth transactions declared nonconvertible, and we voided any provision in the fourth transaction which permitted an increase of issuable common shares of IDC in excess of 1,304,000 or which permitted the exercise of a warrant at a price less than $3.60 per share. We also voided the pledge of TR stock to Heizer.

Prior to the Court of Appeals' consideration of our decision, Heizer presented a recapitalization plan to IDC's shareholders and in a proxy solicitation noted that IDC did not have the financial resources necessary to repay Heizer. Heizer threatened to institute bankruptcy proceedings for IDC if the plan was not approved. We enjoined consummation of the plan pending appeal. We also enjoined Heizer from collecting interest or principal on its loans to IDC. In a petition for supplemental relief, the plain-

tiffs urged that the demand loans held by Heizer were unfair and should be cancelled or reformed into common stock. We denied this petition for supplemental relief as untimely.

The Court of Appeals affirmed in part and vacated in part, with directions to modify. The plaintiffs filed but dismissed an appeal with respect to the first three transactions. The Court of Appeals held in light of the Supreme Court's intervening decision in *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), that our conclusion that a breach of fiduciary duty by majority shareholders in itself violates rule 10b–5 was incorrect and that proof of a 10b–5 violation here would depend upon showings of nondisclosure, materiality, reliance and scienter. The court went on to find that all such elements had been proved on both the fourth and fifth transactions.

As for the fourth transaction, the court found lacking a full disclosure of a critical and material element, the charter amendment increasing the number of authorized shares of common stock from three to seven million. Because the shareholders, under applicable Delaware law, had the power to veto the transaction entirely, proof of materiality established reliance. The court also found the failure to disclose details of the controversial fourth transaction was highly unreasonable and constituted proof of "an extreme departure from the standards of ordinary care" as required by *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

As for the fifth transaction, the Court of Appeals found that because IDC's Board of Directors was virtually controlled by Heizer, which was self–dealing, only the independent shareholders could represent the corporation. Such independent shareholders are entitled to full disclosure.[1] *See Dasho v. Susquehanna Corp.*, 461 F.2d 11 (7th Cir.), *cert. denied*, 408 U.S. 925, 92 S.Ct.

2496, 33 L.Ed.2d 336 (1972). The Court of Appeals found that this disclosure was missing here, inasmuch as the shareholders were first informed of the pledge two months after the transaction. Because under Delaware law the minority shareholders would have had the right to obtain a judicial determination of the fairness of the pledge transaction, the materiality requirement was fulfilled if the controlling shareholder, Heizer, could not demonstrate the fairness of the pledge transaction. The Court of Appeals held that the presumption of unfairness that we applied was appropriate because of Heizer's attempt to divorce its role as creditor from its role as fiduciary. The Court of Appeals found unpersuasive Heizer's arguments in support of the fairness of the pledge transaction. Heizer's first explanation, that the pledge was a device to discourage the "nuisance" suit filed by plaintiffs, was inconsistent with the duty to deal fairly with the minority. The second explanation, that in light of the possible result of plaintiffs' suit the pledge was necessary to preserve Heizer's flexibility of choosing between maintaining its senior position or converting its holdings into common stock, bore no relation to IDC's welfare. Finally, the Court of Appeals found that the failure to disclose was reckless because Heizer must have known that the pledge was for its own benefit and thus would arouse a great deal of opposition.

The Court of Appeals affirmed our nullification of the pledge transaction, the cancellation of the conversion feature, price adjustment, and charter amendment in the fourth transaction. The court, however, reversed our determination that the petition for supplemental relief with respect to the demand loans was untimely. The court held that the loans constituted a "heads–I–win–tails–you–lose" series of transactions, inasmuch as Heizer could obtain a controlling share of IDC's equity if IDC's monitoring effort was successful but could call in its loans and put IDC into bankruptcy if the

---

1. The court conceded that not all directors were controlled by Heizer but held that inasmuch as the lone minority shareholder–director was excluded from the negotiation of the transaction and did not represent the interests of the second largest shareholder, the rule requiring disclosure to the independent shareholders should be applicable.

monitoring venture failed. Thus the court held that

> [I]n order to unravel in an equitable manner the transactions resulting from Heizer's wrongful conduct, the maturities of the loans should be adjusted to make them commensurate with IDC's ability to pay. On remand the District Court should make the necessary determinations and modify the terms of the loans accordingly.

560 F.2d at 254.

Thus the mandate of the Court of Appeals requires us to modify the maturities of the loans commensurate with IDC's ability to pay. Plaintiffs, Heizer, and IDC's management have all submitted proposals for scheduling this repayment. Before we determine which proposal to adopt, however, we must resolve other issues. Plaintiffs have moved for attorney's fees and have sought to compel IDC to redeem the preferred stock held by Heizer. If we decide that plaintiffs are entitled to attorney's fees, and that the fees should be assessed against IDC and not Heizer, we will have to adjust the repayment schedule to reflect the attorney's fees.[2] Similarly, if we hold that IDC should redeem the preferred stock now, IDC's ability to repay the demand loans will be affected and the schedule for repayment will require modification. Thus we will determine first whether IDC must redeem the preferred stock held by Heizer. We will then determine whether plaintiffs are entitled to attorney's fees and who should pay them. Finally, we will consider which of the three repayment plans is best.

### REDEMPTION OF PREFERRED STOCK

Heizer owns 209,048 shares of preferred stock.[3] Although 350,000 shares are authorized, Heizer owns the only preferred stock outstanding. Each preferred share carries 4.4 votes. Plaintiffs seek an injunction requiring IDC to redeem this preferred stock.

Both IDC and Heizer oppose redemption. They claim first that because the issue is governed by state law and is not within the Court of Appeals mandate, we have no jurisdiction to hear the claim. Further, IDC and Heizer argue that even if we do have jurisdiction, IDC is barred by Delaware law from redeeming any preferred stock at this time. Delaware law prohibits a corporation from redeeming stock when the corporation's capital is impaired or would be impaired by redemption. Del.Code Tit. 8, § 160. Section 160 also contains an exception which permits redemption of preferred stock out of capital. IDC and Heizer contend that IDC's capital would be impaired by redemption and that IDC does not have sufficient capital to redeem the preferred stock by resort to the exception.

Plaintiffs contend in response that the redemption issue is encompassed within the Court of Appeals mandate, because before we can determine how to adjust the maturities of the demand loans, we must determine what other obligations IDC must fulfill. One such obligation, according to plaintiffs, is the redemption of the preferred stock. Plaintiffs further contend that the statutory limitations contained in Delaware law are inapplicable because the Delaware law is designed to protect shareholders and creditors, but no common stockholder opposes redemption and IDC has no creditors other than Heizer who might be affected by the redemption. Even if Delaware law does apply, plaintiffs contend that "additional paid–in capital" should be included with capital to trigger the exception in § 160.

Before proceeding to the merits of plaintiffs' motion, we must determine whether we have jurisdiction to hear it. When a district court enters a final judgment in a case, and an appeal is filed, the district court loses jurisdiction over the case. The only further action that the district court may take is action that will aid

---

**2.** None of the proposed schedules provide for the payment of attorney's fees.

**3.** Until October 19, 1979, Heizer owned 300,000 shares of preferred stock. At that time Heizer exercised a warrant to purchase 276,223 shares of IDC common stock at $4.32 per share. Heizer tendered 90,952 shares of the preferred stock in payment of the purchase price.

the appeal or correct clerical errors. 9 *Moore's Federal Practice* ¶ 203.11 at 738–39; *Lloyd v. Lawrence,* 60 F.R.D. 116, 117–18 (D.C.Tex.1973). Then if the Court of Appeals decides the appeal and remands, issues determined by the appellate court cannot be reconsidered by the district court upon remand. *United States v. Parke, Davis & Co.,* 365 U.S. 125, 81 S.Ct. 433, 5 L.Ed.2d 457 (1961). Thus the district court on remand may consider issues raised below but left open by the Court of Appeals, issues ancillary or pendent to those left open, issues for which an independent basis of jurisdiction exists, and issues ancillary to the mandate.

█ Applying these general principles to the instant case, we find that our memorandum decision addressed all five transactions challenged by plaintiffs. Upon appeal, plaintiffs chose not to contest our rulings with respect to the first three transactions. They are, therefore, precluded from asserting, either here or in the Court of Appeals, that defendants violated Rule 10b–5 in those transactions. The Court of Appeals ruled on the 10b–5 contentions with respect to the fourth and fifth transactions. The only issue left open by the Court of Appeals was the maturities of the demand notes. Our remand jurisdiction now extends only to the determination of the modification of the demand notes. Thus unless an independent basis for federal jurisdiction exists or unless the redemption issue is ancillary to the Court of Appeals mandate to reform the demand notes, we have no jurisdiction to hear it.

Even if plaintiffs were to amend their complaint or bring a related action seeking to compel redemption, we cannot conceive of a federal law, nor have plaintiffs suggested any, that would require redemption here and that would convey a basis for federal jurisdiction.[4] Rule 10b–5 applies only to the purchase or sale of securities. Inasmuch as we held that the sale of the preferred stock to Heizer was not a viola-

tion of 10b–5, then the redemption issue does not present a 10b–5 question. Moreover, Delaware law does contain a detailed provision regarding redemption, and the issue is one which is "traditionally relegated to state law." *See Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 478, 97 S.Ct. 1292, 1303, 51 L.Ed.2d 480 (1977). Thus no independent federal jurisdiction exists.

Plaintiffs contend that even if state law is applicable, the redemption issue is ancillary to the mandate. According to the plaintiffs, the mandate requires us to determine IDC's ability to repay the demand notes. IDC's ability to repay is dependent upon its other obligations, one of which is the obligation to redeem the preferred stock held by Heizer. Therefore, in order to determine what obligations will affect IDC's ability to repay the loans, we must determine whether IDC must first redeem the preferred stock. Plaintiffs also claim that Heizer has refused to permit IDC to redeem the preferred stock "in flagrant violation of the ruling of the Court of Appeals in this case that Heizer cannot use its power over the corporate machinery to maintain its control over the corporation." Plaintiffs' Motion for Preliminary and Permanent Injunction, at 3.

We agree with plaintiffs that we should consider IDC's obligations in determining how to schedule repayment of the loans commensurate with IDC's ability to pay. We do not agree, however, that such consideration could result in an order compelling redemption of the stock. The mandate empowers us to formulate a schedule for repayment of the demand notes. We could, ancillary to the mandate, enjoin any action that would frustrate the mandate. We do not believe, however, that the redemption or nonredemption of the preferred stock would carry any potential for frustrating the mandate. The mandate requires only that we reform the demand notes commen-

4. Plaintiffs have sought to avoid the application of state law by claiming that the purposes underlying the state law that would be applicable here, the Delaware law governing redemption, would not be implicated by redemption of the IDC preferred stock held by Heizer. Even if this is true, we do not see how the inapplicability of the Delaware statute would indicate any federal basis for jurisdiction or relief.

surate with IDC's ability to pay. Findings of fact resulting from a determination of what obligations, such as redemption, affect IDC's ability to pay are within the scope of the mandate. Enforcement of those obligations is not. Thus we must make findings with respect to whether Delaware requires redemption, but we are not empowered to order redemption.

■ As a practical matter, it makes little difference whether we have the power to order redemption, because we conclude that Delaware law prohibits redemption of the preferred stock owned by Heizer at this time. The Delaware law governing redemption, Del.Code Tit. 8, § 160, is designed for the benefit of both creditors and shareholders. *See Propp v. Sadacca*, 40 Del.Ch. 113, 175 A.2d 33, 38 (1961), *modified*, 41 Del.Ch. 14, 187 A.2d 405 (1962). Moreover, plaintiffs have offered no support for the contention that no common stock owners oppose redemption, and IDC has creditors other than Heizer. Transcript (Tr.) at 283. Thus we conclude that plaintiffs' assertion that Delaware law governing redemption should not apply because no one here is deserving of its protection is incorrect.

■ Section 160 of the Delaware General Corporation Law (DGCL) provides that a corporation may not redeem its own shares

[W]hen the capital of the corporation is impaired or when such purchase or redemption would cause any impairment of the capital of the corporation, except that a corporation may purchase or redeem out of capital any of its own shares which are entitled upon any distribution of its assets, whether by dividend or in liquidation, to a preference over another class or series of its stock if such shares will be retired upon their acquisition and the capital of the corporation reduced in accordance with §§ 243 and 244 of this title.

A corporation redeeming its own shares would impair its capital within the meaning of § 160 unless it redeems shares out of "surplus." *In Re International Radiator Co.*, 10 Del.Ch. 358, 92 A. 255 (1914). Section 154 of the DGCL defines "surplus" as "the excess, if any, at any given time, of

the net assets of the corporation over the amount ... determined to be capital." Section 154 defines "net assets" as "the amount by which total assets exceed total liabilities." Del.Code Tit. 8, § 154. The most recent IDC balance sheet which is part of the record shows that IDC has assets of $10,278,746 and liabilities of $15,863,161. *See* Plaintiffs' Exhibit 4, IDC Consolidated Balance Sheet as of December 31, 1977. Under Delaware law, IDC has a negative surplus and its capital would be impaired by redemption.

Section 160 provides an exception to the impairment of capital rule. The corporation may redeem preferred stock out of capital if the shares are retired and the capital reduced. Section 154 defines "capital" as "an amount equal to aggregate par value of such shares." The par value of the 300,000 IDC preferred shares is $3,000,000. Although § 154 provides that a corporation may designate an amount in excess of par value to be "capital," the IDC Board of Directors made no such designation. In fact, the Certificate of Amendment of Incorporation of IDC specifically provides that the corporation will not classify as capital the excess of the consideration received for preferred stock over the aggregate par value of the preferred shares. *See* Certificate of Amendment of Certificate of Incorporation of International Digisonics Corp., Exhibit B to Appendix C to Post Hearing Brief of Heizer Corp.

■ Plaintiffs argue, however, that the item on IDC's balance sheet designated as "paid–in capital" indicates the amount of IDC's "capital" for the purpose of redemption under § 160. We agree with defendants, however, that "paid–in capital" is merely a descriptive accounting term and certainly cannot be taken as a corporate designation of "capital" in excess of par value as defined by § 154. *See* G. Dick & R. Rickert, *Accounting Trends & Techniques* (31st ed. 1977). Therefore, § 160 of the DGCL prohibits redemption of IDC preferred stock at this time.

## ATTORNEY'S FEES

### 1. *Assessment of Fees Against Heizer Corp.*

Plaintiffs seek attorney's fees from Heizer or IDC. They first seek fees from Heizer under the "bad faith" exception to the "American rule" that a winning litigant cannot recover attorney's fees from the loser. If plaintiffs' counsel (hereinafter petitioners) cannot recover fees from Heizer, they seek to be paid by IDC on the grounds that plaintiffs' derivative suit substantially benefited the corporation. Petitioners Edward Slovick and James S. Gordon seek fees of $90 per hour for 3,965 hours, $95 per hour for 498.5 hours, and $100 per hour for 1,091.75 hours, for a total of $489,082.50. They also seek a multiplier of 3.5 imposed on the 3,695 hours at $90 per hour (or $315 per hour) and a multiplier of 2.0 imposed on the remaining hours (or $190–200 per hour), for a total fee of $1,476,990. A. Bradley Eben and Michael Rosenhouse, who assisted Slovick and Gordon at various times, seek $6,656.00 and $2,952.00 respectively. Additionally, J. Samuel Tenenbaum and Theodore Becker, who assisted Slovick and Gordon on the appeal, have filed a petition for fees at the rate of $75 per hour for 350.05 hours, with a multiplier of 3, and $75 per hour for 73 hours, with a multiplier of 2, for a total of $89,711.25. On April 5, 1978, April 16, 1979 and November 16, 1979, we entered orders awarding Slovick and Gordon interim fees in the amounts of $230,000, $70,000, and $75,000 respectively, which have been paid.[5]

Before proceeding to the specifics of the determination of the proper amount of fees, we will first determine whether IDC or Heizer is liable for any of plaintiffs' attorney's fees. Both IDC and petitioners contend that Heizer should be liable for fees under the "bad faith" exception to the American rule. The American rule provides that a losing party is not liable for the prevailing party's fees. Under the "bad faith" exception, however, the prevailing party is entitled to fees from the losing party if that party "has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *F. D. Rich Co. v. Industrial Lumber Co.*, 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974). IDC has sought to assess petitioners' fees and its own fees against Heizer. We will consider fees for petitioners first, separate from the fees incurred by IDC.

Petitioners and IDC point to alleged bad faith conduct of Heizer before and during the suit and after trial. Before suit, Heizer allegedly acted in bad faith by entering into the fourth transaction in which Heizer obtained 87% of the pro forma equity of IDC at an inadequate price. As for conduct occurring during the pendency of the action, petitioners and IDC point to the fifth,

---

**5.** On June 6, 1980, while this matter of fees was under advisement and after they had been paid $375,000 in interim fees, Messrs. Gordon and Slovick requested additional fees of $2,656.00 for services relating to a skirmish occasioned by a proposal made by IDC's board. We commented at the time that the security bar did not believe in working free.

In contrast, we recently approved fees totalling $31,887.50 for five lawyers who were on trial for four weeks in *United States v. Quintero–Medina*, 489 F.Supp. 82 (N.D.Ill.1980). The lawyers in the *Quintero–Medina* case frequently donate their time to the defense of indigent persons accused of crime. The fees we approved were the maximum allowable under the Criminal Justice Act.

When we compare the fees awarded here with those in *Quintero–Medina* we wonder about our values and we recall the admonition of our first mentor in *Harris v. Chicago Great Western Ry. Co.*, 197 F.2d 829, 835 (7th Cir. 1952):

"We think it not amiss to suggest, in passing, that we are not favorably impressed with the extreme liberality to themselves, ... which lawyers have too often been prone to demonstrate in applying for fees. We regret that the amounts requested ... bring to us the unwelcome aroma of the tactics of a pressure group,—a category, in which the bar, with its traditions and ideals, should be too proud to allow itself to be included. In our present–day economy, with taxing power and inflation running rampant, hand in hand, temptation comes to some to try to get more and more with which to counteract these two ravenous factors of our present–day economic life,—a course of conduct which, if permitted to thrive indefinitely, may ultimately destroy our very economic and political existence."

or pledge, transaction, which we found, and the Court of Appeals agreed, to be an attempt by Heizer to discourage this litigation and to protect itself from the results of the litigation. As evidence of bad faith after trial but before appeal, plaintiffs and IDC focus on Heizer's proposed recapitalization plan which Heizer attempted to force upon IDC's shareholders by threatening to put IDC into bankruptcy unless the plan were approved.

Heizer responds first by contending that bad faith attorney's fees, which are punitive in nature, cannot be awarded in 10b–5 cases, because the Securities Exchange Act of 1934 does not permit awards of punitive damages for violations of § 10(b). Even if bad faith attorney's fees could be awarded here, Heizer argues that it did not act in bad faith and attempts to introduce a legitimate purpose for all of its allegedly bad faith action.

■ We must apply the test for awarding bad faith attorney's fees stringently. *See Satoskar v. Indiana Real Estate Commission,* 517 F.2d 696 (7th Cir. 1975). Only in "exceptional cases and for dominating reasons of justice" can such an award be justified. 8 *Moore's Federal Practice,* ¶ 54.-77[2] at 1709–11. The Seventh Circuit has held, however, that the conduct justifying an award of attorney's fees under the bad faith doctrine may be part of the conduct necessitating the action or conduct occurring during the course of the litigation. *Bond v. Stanton,* 528 F.2d 688, 690 (7th Cir.), *vacated on other grounds,* 429 U.S. 973, 97 S.Ct. 479, 50 L.Ed.2d 581 (1976). *See also Hall v. Cole,* 412 U.S. 1, 5, 15, 93 S.Ct. 1943, 1946, 1951, 36 L.Ed.2d 702 (1973).

■ Therefore, two possible bases underlie an award for bad faith: conduct occurring during the litigation having an impact on the litigation process, and conduct inherent in the substantive violation. Petitioners and IDC allege that the fourth transaction is in the latter category and the fifth transaction and the proposed recapi-

talization plan fall in both categories. In the context of this case, however, we conclude that only bad faith conduct occurring during the course of this litigation, and not conduct necessitating the action, may be the basis for an award of fees. In *Straub v. Vaisman & Co., Inc.,* 540 F.2d 591 (3d Cir. 1976), the Third Circuit reversed a district court's award of bad faith fees in a 10b–5 action. The district court had based its award on the "wilful and wanton fraud" of the defendants in selling stock to plaintiffs. The court noted that the Securities Exchange Act prohibits a recovery in excess of actual damages, and that therefore punitive damages are prohibited. *See* 15 U.S.C. § 78bb(a); *Gould v. American–Hawaiian Steamship Co.,* 535 F.2d 761 (3d Cir. 1976). The fees that the district court awarded in *Straub* resulted not from conduct occurring during the litigation process but from bad faith conduct "inherent in the fraudulent acts which constituted the cause of action itself." 540 F.2d at 599. Inasmuch as bad faith attorney's fees are punitive in nature, *see Hall v. Cole, supra* at 5, 93 S.Ct. at 1946, the *Straub* court held that an award of bad faith attorney's fees for the fraudulent acts would violate the Exchange Act's proscription of punitive damages.[6]

Petitioners and IDC argue that *Straub* is logically unsound because courts will often award punitive damages under a state law claim for conduct which violates both state law and rule 10b–5. *See, e. g., Flaks v. Koegel,* 504 F.2d 702, 706–07 (2d Cir. 1974). Thus plaintiffs and IDC argue that attorney's fees for defendants' bad faith conduct would be a punitive award under a claim other than the 10b–5 claim. We are inclined to agree with IDC that the holding in *Straub* is overly strict in prohibiting attorney's fees in all 10b–5 cases in which the alleged bad faith conduct is inherent in the 10b–5 claim. In the context of this case, however, we do not believe that the prelitigation alleged bad faith conduct, which was inherent in the 10b–5 claim underlying the fourth transaction, supports an award of fees on a bad faith theory.

**6.** The court recognized, however, that even in 10b–5 suits the court can award bad faith fees for conduct occurring during the course of the litigation. 540 F.2d at 600.

Petitioners and IDC argue that "not only" was the fourth transaction a violation of 10b–5, but it was also "reckless" and "highly unreasonable."[7] The recklessness or unreasonableness was an element of the 10b–5 claim. The plaintiffs could not prove a violation of 10b–5 without showing scienter as required by *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). If proof of such recklessness alone were enough to constitute bad faith sufficient to justify an award of attorney's fees, every derivative plaintiff prevailing in a 10b–5 cause of action would be entitled to attorney's fees. We do not believe that such a rule would comport with the stringent requirements of the bad faith exception, and we decline to apply such a rule here.

■ Presumably, the petitioners and IDC would argue that the degree of recklessness is relevant in determining bad faith and that some reckless conduct would be sufficient to prove a 10b–5 violation but not sufficient to justify a bad faith fee award. Although such lines are difficult to draw, we should not foreclose the possibility that a 10b–5 plaintiff could prove that a defendant's behavior in the conduct giving rise to the cause of action was so outrageous as to justify an award of bad faith fees. Heizer's conduct in the fourth transaction is not such a case.

Although Heizer's conduct during the fourth transaction violated Rule 10b–5, we do not believe that the conduct was so egregious as to constitute bad faith. This is not a case in which the defendant defrauded the corporation. *See Straub, supra.* Rather, Heizer imposed an unfair transaction on a corporation badly in need of funds, and Heizer violated Rule 10b–5 by failing to properly disclose all of the facts regarding the transaction. Therefore, although Heizer behaved recklessly, its ac-

tions were at least in part the product of market considerations. Therefore the fourth transaction cannot be the basis for an award of fees under the bad faith exception.

We come to the same conclusion with respect to the recapitalization proposal. Although we enjoined implementation of the proposal, we made no findings as to the fairness of the plan. Moreover, as with the fourth transaction, we cannot now say that the plan was so egregiously unfair as to justify an award simply by virtue of its unfairness. Thus unless the proposal was designed to impact on the litigation process, we will not assess fees against Heizer for proposing the plan.

We do not believe that the recapitalization plan had sufficient potential to frustrate the litigation so as to constitute bad faith. As Heizer notes, prior to the proposal, we had denied supplemental relief as to the demand notes. Because the notes remained obligations of IDC, recapitalization may have been desirable and even necessary. *See* Crossett testimony, Tr. 463, 492–94. Furthermore, Heizer gave plaintiffs notice of the plan sufficient to prevent its implementation, and the plan as proposed could have been adjusted, by cancelling the preferred stock, were the Court of Appeals to grant relief as to the demand notes. Thus although the notice to the shareholders appeared to be coercive, we do not believe that the recapitalization had sufficient potential to frustrate the litigation so as to warrant an award of fees on a bad faith theory.

■ We come to a different conclusion, however with respect to the fifth, or pledge, transaction. Although the pledge transaction itself constituted a 10b–5 violation, it occurred during the course of the litigation. Moreover, unlike the fourth transaction, the

---

**7.** As a preliminary matter, we must point out that we do not regard the findings that we made following the trial to be conclusively established. Although the Court of Appeals affirmed our holdings on the fourth and fifth transactions, it did so on different grounds. Therefore we may consider our original find-

ings, but defendants are not precluded by collateral estoppel from introducing new evidence or renewing their arguments. 1B *Moore's Federal Practice*, ¶ 0.416[2] at 2231. Of course, the findings and holdings of the Court of Appeals are binding upon us.

fifth transaction contained elements directly related to the litigation process. We found that Heizer blatantly breached its trust by taking the pledge to protect itself from the outcome of this pending litigation. 411 F.Supp. at 37. The Court of Appeals agreed, characterizing the pledge transaction at least in part as "a device to discourage what [Heizer] considered to be a nuisance suit." 560 F.2d 251.[8]

Thus the pledge transaction was an attempt by Heizer to frustrate the litigation by rendering useless any relief plaintiffs could obtain. The pledge is therefore analogous to a frivolous defense or counterclaim, presented solely to harass a plaintiff and delay his recovery, for which bad faith attorney's fees are clearly available. Indeed, the pledge had the potential for even more impact on the litigation than a frivolous defense. A frivolous defense only delays ultimate recovery, but the pledge here could have rendered any recovery meaningless. As conduct occurring during litigation, and as action taken in response to that litigation, even the *Straub* court would not preclude attorney's fees on a bad faith theory here. Thus we hold that petitioners are entitled to fees from Heizer for its bad faith conduct in the fifth transaction.

 Petitioners and IDC have also argued that Heizer should be liable for fees by virtue of its violation of fiduciary duties owed to IDC. Relying on the Court of Appeals' determination that Heizer acted in a fiduciary capacity to IDC, plaintiffs and IDC cite state law cases indicating that a fiduciary violating its duties is liable for the plaintiff's attorney's fees. *See, e. g. Wilmington Trust Co. v. Coulter*, 42 Del.Ch. 253, 208 A.2d 677, 682–83 (1965). Further, petitioners and IDC argue that even if federal law controls, a fee award for violation of fiduciary duties is an exception to the American rule, either as a separate exception or as a subset of the bad faith exception.

Because we have held that Heizer is liable for fees with respect to the fifth transaction, we need only consider Heizer's liability for fees on a breach of fiduciary duty theory with respect to the fourth transaction and the recapitalization plan. Federal law governs this issue. Plaintiff's complaint did not allege that Heizer violated state law either in the fourth transaction or in the attempt to effect a recapitalization plan. Although the Court of Appeals considered Heizer's position as a fiduciary in determining what disclosure obligations Heizer had under 10b–5, petitioners cannot boost this discussion into a finding on a state law claim. Plaintiffs' action sought to redress a violation of federal law; federal law will determine whether attorney's fees will be awarded.

Unless an exception to the American rule applies, the plaintiff in a derivative suit is not entitled to fees from a losing defendant. *See Bailey v. Meister Brau*, 535 F.2d 982 (7th Cir. 1976). Although petitioners have argued that a breach of fiduciary duties qualifies as an exception to the American rule, the cases petitioners and IDC have cited in support of the proposition that a violation of fiduciary duties justifies a fee award either as part of the bad faith exception or as a separate exception do not support an award of fees in the instant case. The cases relied upon by petitioners and IDC and other cases in which court assessed fees against a fiduciary, involve fiduciaries in substantially different positions from Heizer's relationship to IDC. In *Wolff v. Calla*, 288 F.Supp. 891 (E.D.Pa.1969), for example, the defendant had refused to pay money he held in trust to the intended beneficiary. In *Kiser v. Miller*, 364 F.Supp. 1311 (D.D.C.1973), *aff'd in part and remanded in part*, 517 F.2d 1275 (D.C.Cir. 1975), the defendants were trustees of the United Mine Workers of America Welfare and Retirement Fund, who had violated fiduciary duties owed to union members.[9]

---

8. This finding was necessary given the court's consideration of the fairness of the pledge as an element of the reliance requirement.

9. The fees in *Kiser* were paid out of the trust fund, so that the district court based its fee award on both the bad faith and common fund theory.

Similarly, in *Richardson v. Communications Workers of America*, 530 F.2d 126 (8th Cir.) *cert. denied*, 429 U.S. 824, 97 S.Ct. 77, 50 L.Ed.2d 86 (1976), the defendant was a union which had violated its fiduciary duty by failing to pursue the plaintiff's employment rights and actually lobbying for his discharge. *See also In re Johnson*, 518 F.2d 246 (10th Cir.), *cert. denied*, 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 125 (1975) (fees assessed against trustee of a creditor's trust).

In all of these cases, the defendant–fiduciary had an obligation to its beneficiaries which should have remained unclouded by any personal interests or obligations. In making this distinction, we do not mean to deprecate the fiduciary duty owed by Heizer to IDC and its minority shareholders. We cannot be unmindful, however, of the fact that Heizer had its own interests and the interests of its shareholders to protect. Therefore, the nature of the fiduciary duty in the cited cases is sufficiently distinguishable from Heizer's fiduciary duty to induce us to decline to award fees because of Heizer's violation of that duty.

▆ Therefore, Heizer is liable to pay petitioners' fees on a bad faith theory only for the fifth transaction. And this liability does not extend to fees for all of the charged hours. If a defendant in a protracted proceeding submits a frivolous defense which consumes one day of plaintiff's time the plaintiff is certainly not entitled to all of its fees on a bad faith theory. Rather, the bad faith defendant should be required only to recompense the prevailing plaintiff for the time spent to meet the bad faith defense. *See Browning Debenture Holders' Committee v. Dasa Corp.*, 560 F.2d 1078, 1089 (2d Cir. 1977). In the instant case, however, we believe that an award of fees limited to the amount of time spent by petitioners on the fifth transaction would not be fair. Unlike most frivolous defenses, the effects of which are limited in time or scope, the effects of the pledge permeated the entire litigation. Because the determi-

nation of bad faith is based on Heizer's attempt to frustrate the entire litigation and render useless any relief plaintiffs might obtain, Heizer's liability for plaintiffs' attorneys' fees should be for a percentage greater than the percentage of hours spent on the fifth transaction.

Defendants claim that 9% of petitioners' time may be attributed to the fifth transaction. They base this figure on the amount of time devoted to the pledge transaction at trial. *See* Post Trial Brief of Heizer Corporation at 126. We have examined petitioners' fee petition, and with a few exceptions, we cannot determine with any specificity the amount of time devoted to the fifth transaction. Moreover, we assume that any reconstruction at this point would be inaccurate and speculative. But because we believe that petitioners are entitled to an award of fees greater than that which would represent actual hours spent, a determination of the exact number of hours is not crucial. Therefore, we hold that Heizer is liable for fees awarded for 25% of the hours that we find petitioners have reasonably spent on the case.[10]

▆ To the extent that IDC's motion seeks to assess against Heizer the fees incurred by IDC's counsel, the motion is denied. We have no doubt, contrary to plaintiffs' assertions, that IDC exercised independent judgment, separate from Heizer's, with respect to this litigation. Nevertheless, IDC either opposed plaintiff's efforts or remained neutral throughout the litigation. Given IDC's refusal to oppose any of Heizer's illegal conduct, an order forcing Heizer to pay IDC's fees on either a bad faith or violation of fiduciary duty theory would be inappropriate.

### 2. *Assessment of Fees Against IDC Corp.*

▆ In a derivative suit brought on behalf of a corporation, the plaintiffs are entitled to reimbursement of their costs, includ-

**10.** The multiplier to be applied to those hours and the method for apportioning the 25% are discussed *infra*.

ing attorney's fees, from the corporation if the suit confers a substantial benefit on the corporation. *Mills v. Electric Auto–Lite,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). This rule applies regardless of whether the plaintiffs have produced a fund for the corporation from which the fees may be paid. 7A C. Wright & A. Miller, *Federal Practice & Procedure,* § 1841 at 444 (1972). Thus the first question in determining whether IDC is liable for fees is whether the litigation benefited IDC.

Petitioners argue that the relief obtained produced several benefits. First, the cancellation of the convertibility features of the notes issued in the fourth transaction and the cancellation of Heizer's right to purchase 5,513,908 shares of IDC common stock at $1.00 per share benefited the corporation because the $1.00 per share price was and is below the true value of IDC stock. Second, the cancellation of the pledge of TR stock to Heizer prevented Heizer from foreclosing on its loans and thereby seizing IDC's most profitable asset. Third, by obtaining an injunction against the 1976 Plan of Recapitalization, plaintiffs prevented defendants from mooting the relief and attendant benefits resulting from our decision on the fourth transaction. Further, consummation of the plan would have been detrimentally unfair to IDC. Fourth, the prospective relief granted by this court and the Court of Appeals requires Heizer to deal fairly with IDC and to obtain approval from the common stockholders other than Heizer before entering into securities transactions with IDC. This relief benefits IDC by preventing, in the future, the types of securities law violations Heizer inflicted on IDC in the past. The final benefit is the supplemental relief granted by the Court of Appeals, pursuant to which Heizer is enjoined from enforcing the demand notes and IDC is permitted to repay the loans commensurate with its ability to pay. This relief benefits IDC by preventing Heizer from forcing IDC into bankruptcy in order to collect on the loans. The supplemental relief also benefits IDC by allowing IDC to repay the loans only as it is able to do so.

■ In a nonfund case, the benefit a derivative suit provides to a corporation is difficult to quantify.[11] Nevertheless, a corporation may be benefited by a nonfund case, and an award of fees is not precluded by the difficulty or even impossibility of assigning a specific monetary value to the benefit received. *See Ramey v. Cincinnati Enquirer, Inc.,* 508 F.2d 1188 (6th Cir. 1974); *Merola v. Atlantic Richfield Co.,* 515 F.2d 165 (3d Cir. 1975). In fact, the *Mills v. Electric Auto–Lite* Court noted that a nonpecuniary benefit may justify an award of fees. 396 U.S. at 396, 90 S.Ct. at 627. *See also Reiser v. Del Monte Properties Co.,* 605 F.2d 1135 (9th Cir. 1979). The *Mills* Court reasoned that a plaintiff, by vindicating an important statutory policy, may render substantial service to the corporation.

Although plaintiffs here vindicated an important statutory policy by challenging Heizer's violations of Rule 10b–5, we would not be inclined to award substantial fees on that basis alone. Moreover, the Supreme Court's decision in *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), which laid to rest the private attorney general theory as a basis for awarding attorney's fees, casts doubt upon the propriety of awarding fees solely for the vindication of a statutory policy, even if the corporation can be said to have been benefited. Therefore we will focus on the pecuniary benefit that IDC received from this litigation, keeping in mind that this benefit need not be proved with specificity.

■ Heizer contends that IDC received no benefit from the cancellation of the convertibility features of the fourth transaction notes as well as the cancellation of the $1.00 stock warrants, because the fact that plaintiffs reduced Heizer's pro forma equity

---

**11.** On April 15, 1978, when we awarded petitioners interim fees, we entered findings of fact to the effect that IDC had been benefited by the instant litigation in all of the ways enumerated by plaintiffs here. We believe, however, that a reconsideration of the benefit, if any, received by IDC is desirable.

in IDC from 87% to 61% is of no real economic value to IDC. More importantly, IDC stock is not worth $1.00 per share and would not have been worth $1.00 prior to the expiration of the warrants in 1981. Thus Heizer claims that it would not have wanted to exercise the warrants, and even if it had, IDC would have received more for the warrants than its stock is worth. Heizer attacks petitioners' contention that IDC stock is worth considerably more than $1.00 per share and questions the reliability of Fred Holubow, plaintiffs' expert, whose projections guided plaintiffs' evaluation of the value of IDC shares.

Petitioners respond that if the stock is worth less than $1.00 now, it must have also been worth less than $1.00 in 1971, when the warrants were issued, because in 1971 IDC was suffering substantial losses, while it is currently earning substantial profits. These profits, according to Heizer's expert, should continue. Plaintiffs question Heizer's vigorous defense of the fourth transaction warrants if they are, and continue to be, worth less than $1.00. Moreover, according to the projections, by 1981, when the warrants would have expired, IDC would have earned substantial income and the stock would be worth more than $1.00.

As we noted earlier, we cannot precisely quantify the benefit realized by IDC. With respect to the fourth transaction, we believe that a determination of benefit is governed by the value of IDC stock. If by exercising the warrants Heizer could have received shares of IDC common stock for less than their value, then IDC has realized a benefit through cancellation of the warrants. We will concentrate here on the present and future value of IDC stock, because the parties have based their arguments on that value, and because past value becomes less significant if the value of the stock has now fallen below the warrant price. Moreover, as petitioners note, IDC is in a constantly improving financial position, so it is unlikely that the value of its stock would now be

worth less than in 1971. Because of the speculative nature of the benefit conferred in a nonfund case, however, we believe that in addition to present value the potential value of IDC stock in 1981, when the warrants would have expired, is relevant.[12]

Plaintiffs and Heizer have presented two widely differing views on the value of IDC stock. On the one hand, Heizer's experts, Hendrick and Browning opined that IDC stock is worth $0.55 per share and the corporation is worth $5.5 million, substantially less than the debt owed to Heizer. On the other hand, plaintiffs' expert, Holubow, testified that in his opinion, based on Browning's projections, IDC is worth between $14,000,000 and $20,000,000, a figure which would indicate that IDC's common stock is worth substantially more than $1.00 per share. We suspect, as is the case with most expert testimony advocacy, that the true value of IDC lies somewhere between the two extremes. For purposes of determining benefit to IDC, we need not determine which opinion is correct. We need decide now only whether a probability exists that at any time prior to 1981 a purchaser of IDC stock would be willing to pay more than $1.00 per share. To make this determination, a consideration of the valuation methods the various experts used is instructive.

Browning, Heizer's expert, valued the corporation at $5.5 million. He purported to value IDC as a going concern and calculated the price a purchaser would be willing to pay for the assets and liabilities needed to continue the business as a going concern. Tr. 618. The assets would consist largely of accounts receivable, and the liabilities would consist of accounts payable, the obligation to Burroughs Corporation for a computer, and the indebtedness to acquired companies. The liabilities, however, would not include the debt to Heizer. Tr. 618–619. *See* Heizer Exhibits 21–A, 21–B, 21–C. The parties have referred to this entity

---

12. To a certain extent, of course, even determining the benefit to IDC through a determination of the present value of IDC stock is fraught with speculation, because the current value of that stock may have been completely different had the instant litigation not taken place.

as "IDC Adjusted." Browning compared IDC Adjusted to a group of advertising companies, selected for the similarity of their business to IDC's business. Tr. 626–27. He derived the price/earnings ratio for each company and determined, on the basis of 1978 projected earnings, that a price/earnings ratio of 6.6 would be the ratio at which a purchaser would be willing to invest in IDC. Tr. 630. By multiplying 1978 projected earnings by the 6.6 figure, Browning arrived at a value of $5.5 million. This figure would reward an investor with a 15% return on his investment. Browning admitted on cross examination that for the purposes of valuing IDC, he had not considered the $18,000,000 in earnings by 1986 that he had projected for purposes of reconstructing the demand debt. Tr. 671–74.

Heizer's other expert, Hendrick, testified that in his opinion IDC stock is currently worth $0.55. He arrived at this figure by comparing IDC to a composite of nine publicly held companies involved in specialized data processing services for corporate clients. He derived a composite price/earnings ratio of 8.6 and a composite price/net worth ratio of 2.3. He then calculated a mean earnings figure of $0.16 per share for IDC for 1976 and 1977, and a net worth for 1977 of $271,000 or $0.35 per share. Next he constructed a "theoretical net earnings evaluation" of $1.38 by multiplying the $0.16 mean earnings by the composite price/earnings ratio of 8.6. He also multiplied the estimated net worth per share of $0.35 by the composite price/net worth ratio to arrive at a "theoretical net worth evaluation" of $0.81. He then took the mean of the two abstract figures, $1.38 and $0.81, to arrive at a $1.09 figure as the price that IDC stock would bring in the over–the–counter market. Given several uncertainties facing the company, however, such as the effects of this litigation and the lack of a public market, Hendrick applied a 50% discount to the $1.09 figure to arrive at a $0.55 per share figure. See Heizer Exhibit 37 at 14–23. Hendrick, like Browning, did not consider the projections for future earnings, because he did not believe that the projections were certain enough to be reliable. Tr. 1418.

In contrast, plaintiffs' expert, Holubow, relied heavily on the earnings projected by Browning. Holubow took the projected earnings through 1986, used the construct for "IDC Adjusted" as created by Browning and determined the projected stream of cash available for dividends to a purchaser through 1986. See Plaintiffs' Exhibit 22. Using a 15% discount figure provided by plaintiffs' counsel, Holubow calculated the present value of these dividends as $7,352,-000. Plaintiffs' Exhibit 23. He then calculated two separate market values for IDC Adjusted. The lower value was computed by taking the projected net income of IDC in 1986 and multiplying that by the price/earnings ratio, 6.6, found to be appropriate for IDC by Browning. This product, $6,771,000, discounted to present value by a 15% factor, was added to the present value of cash dividends available to IDC to yield a lower value of $14,123,000. The upper value was the sum of (1) the present value of cash dividends and (2) the product of the 1986 value and a 13 price/earnings ratio, the composite of price/earnings ratios for the computer companies that Heizer used for comparison in valuing IDC. See Plaintiffs' Exhibits 12 and 24. This computation yielded an upper value of $20,568,000. Either value would indicate a value for IDC stock far greater than $1.00 per share. Holubow testified that the method of valuation he used was accepted and used in the financial community. Tr. 1088, 1089.

Our task is not to determine with exactitude the present value of IDC stock. If it were, we might be more inclined to ignore or at least discount the projected future earnings and the figures Holubow derived from them. In addition, we recognize the manipulation of figures that both sides have used to arrive at figures most favorable to them. But inasmuch as we are concerned with determining future as well as present value of IDC stock, we believe that the projected earnings are relevant. This conclusion is tempered by the fact that the projections extend through 1986, and the warrants would have been exercisable

only through 1981. Nevertheless, we are convinced that a potential investor in 1981 would be influenced by the possibilities for growth exhibited by Browning's projections. *See* Tr. 1098.

Moreover, we believe that the Browning projections, although necessarily speculative, are sufficiently certain to warrant our consideration. Browning, after a careful study of IDC, based the projections on IDC's 1978 Business Plan, which all parties concede reflected IDC management's considerable skill in predicting IDC's future. The conclusion that the Browning projections are relevant to a determination of value would not be inconsistent with a determination that IDC's proposed repayment plan, which discounts projected earnings by 35%, is preferable to Browning's plan. In light of the Court of Appeals holding, we must be certain that any repayment schedule is certain to guard against unforeseen circumstances and to be commensurate with IDC's ability to pay. Given our conclusion with respect to the speculative nature of a determination of benefit, we need not be so certain in determining the value of IDC stock.

Furthermore, we find that the 15% rate of return counsel instructed Holubow to use is reasonable, given IDC's projected future earnings. *See* Tr. 1093–94. Moreover, Browning concluded that his valuation would yield a 15% return, which he thought was "appropriate." Tr. 630.

Neither Browning nor Hendrick considered the Browning projections in valuing IDC. Holubow, using the projections, arrived at a substantially greater value for IDC. Given our conclusion with respect to the projections, we find that a reasonable likelihood exists that by 1981 the $1.00 stock warrants would have been exercisable at a price which would be less than the value of IDC stock. We recognize the speculation inherent in this conclusion, but the speculative nature of the benefit is best addressed in this case in the determination of what multiplier, if any, to impose on petitioners' fees.

The second benefit to IDC which plaintiffs claim is the cancellation of the pledge of TR stock consummated in the fifth transaction. We have already indicated that one of Heizer's purposes in seeking this pledge was to blunt the effects of this litigation. Thus plaintiffs, by obtaining a cancellation, protected whatever other benefits the litigation produced. Moreover, the TR stock was IDC's only valuable asset, and Heizer could have recouped its losses by foreclosing on the TR stock. Although Heizer contends that it never intended to foreclose on the pledge, this assertion is inconsistent with the Court of Appeals' finding that the purpose of the pledge was to protect its investment in IDC by threatening foreclosure on the pledge. 560 F.2d at 251. Moreover, Heizer could have foreclosed on the TR pledge and still maintained IDC as a going concern. Again, the question of whether Heizer would have forced IDC into bankruptcy or foreclosed on the TR stock is speculative. Given our findings and the Court of Appeals' finding with respect to Heizer's purpose in entering the pledge transaction, however, we believe that plaintiffs were entirely justified in attempting to cancel the pledge transaction and rendered substantial benefit to IDC in doing so.

The third alleged benefit is the injunction against the recapitalization plan that Heizer proposed in 1976. Under the recapitalization plan, all of the demand notes would have been converted to preferred stock, at $1.00 per share. The preferred stock would have carried mandatory dividend and redemption requirements to be met out of IDC's earnings in excess of $300,000 per year. Failure to meet these requirements would have resulted in the acceleration of the full principal amount of the outstanding preferred stock. The plan also would have given Heizer an additional six million warrants exercisable until 1986 at $1.00 per share. *See* Heizer Exhibit 24–B.

Given our conclusion that IDC stock probably would have been worth more than $1.00 in 1981, the benefit from preventing Heizer from obtaining six million $1.00 warrants exercisable until 1986 is obvious.

Moreover, the plan required redemption, on a rigorous schedule, of the preferred stock issued in exchange for the demand notes. Now, however, IDC may repay the demand notes on a schedule commensurate with its ability to do so. Thus IDC is in a better position with respect to the repayment of the demand notes than it would have been with respect to the equivalent redemption of the preferred stock issued pursuant to the plan. Heizer's argument in response to this reasoning seems to be that all agree that a recapitalization would be in IDC's best interest, and that plaintiffs' efforts have frustrated a recapitalization. Only a fair recapitalization, however, is in IDC's best interests, and given our conclusion with respect to the value of IDC stock and the rigorous requirements with respect to redemption of preferred stock that would have been placed on IDC by virtue of the plan, we have serious doubts about the fairness of the 1976 plan. Thus we find that IDC has realized benefit from plaintiffs' efforts with respect to the recapitalization plan.

The next benefit alleged is the reformation of the demand notes ordered by the Court of Appeals. We agree with plaintiffs that IDC has benefited from this relief. Not only has IDC received an extension on the loans, but it has received an extension that, according to the mandate, cannot unduly tax IDC's resources. In addition, Heizer's claim that their intentions with respect to bankruptcy proceedings were only to institute Chapter XI proceedings is difficult to credit at this late date. Heizer's counsel indicated in 1976 that Heizer had "every intention of taking [IDC] into bankruptcy . . ." if it could not collect the debt. Tr. of Proceedings, June 18, 1976.

Even if by saying "bankruptcy," Heizer meant Chapter XI proceedings, IDC would not now be in the same or better position under a Chapter XI plan than it would be under the mandate. IDC would not have been able to implement a Chapter XI plan without prior approval from Heizer. Under the old Bankruptcy Act, which was in effect until October 1, 1979, and under which IDC and Heizer would have proceeded, a Chap-

ter XI plan could not be confirmed unless the plan was accepted by a majority, in both number and amount, of all creditors with proved and allowed claims. 52 Stat. 911, § 1 (formerly at 11 U.S.C. § 762). Heizer, which held the majority of the amount of claims against IDC, thus could have blocked any plan proposed by IDC. IDC does not have to face this obstacle under the mandate. Moreover, given the disparity between IDC's and Heizer's view of IDC's ability to repay the loans, and given our choice *infra* regarding the repayment schedule, IDC has achieved a substantial benefit by not having to obtain Heizer's approval of the repayment plan.

The final benefit is the injunction requiring Heizer to obtain shareholder approval for any Heizer transaction with IDC and to disclose any future transaction involving securities of IDC. As plaintiffs note, this goes beyond the requirements of the securities laws. Given Heizer's previous violations of the securities laws, such an injunction is of obvious benefit to IDC.

Therefore, we hold that IDC has been benefited in all of the ways alleged by plaintiffs. We must caution, however, that we recognize an element of speculation inherent in finding benefit in every instance. Although we do not believe that this uncertainty warrants a denial of fees, we do believe that it justifies consideration in assessing a multiplier.

The next step in assessing attorney's fees is determining the base fee, computed by multiplying a reasonable hourly rate by the number of hours expended. Neither Heizer nor IDC have challenged the rates charged by Messrs. Slovick and Gordon. Thus we will approve their rates of $90 per hour prior to March, 1978, $95 per hour prior to September 1, 1978, and $100 per hour after September 1, 1978.

IDC has objected to the adequacy of time records submitted by petitioners. IDC also claims that some of the hours are noncompensable. A ruling that IDC is correct with regard to these claims will obviate the need to determine the adequacy of the time rec-

ords with respect to these hours. Therefore, we will consider first the claim that petitioners are not entitled to fees for hours spent on unsuccessful claims and for hours spent on the issue of attorney's fees.

Defendants claim that hours spent litigating unsuccessful claims are not compensable. Specifically, they point to the 10b–5 claims regarding the first three transactions, the motion to compel redemption of the preferred stock, the motion for an appointment of a receiver for IDC, the motions to enjoin IDC shareholders' meetings, and the motion to vacate our order of May 28, 1976. According to defendants, the hours spent litigating these unsuccessful claims did not benefit IDC and so IDC should not be forced to pay for them. The petitioners respond to this by arguing that these claims resulted in an indirect benefit to IDC and litigation on these claims was necessary to achieve the desired results with respect to the claims on which plaintiffs were successful.

■ The issue with respect to unsuccessful claims is whether the hours spent on those claims benefited the corporation in any way, directly or indirectly. If to achieve success on some claims, proof relating to the other claims was necessary, then the hours are compensable. Or if litigation on a particular claim indirectly leads to some beneficial relief, the hours are compensable. See Stanford Daily v. Zurcher, 64 F.R.D. 680 (N.D.Cal.1974). This test should be a broad one, because we should not force plaintiffs' attorneys to predict precisely the extent of a violation or the relief obtainable. See id. at 684. Considerations relevant to these determinations are whether the unsuccessful claims were tangential to the primary cause of action or relief sought, Swanson v. American Consumer Industries, Inc., 517 F.2d 555 (7th Cir. 1975), whether the claims were "extravagant" or "unfounded," id. at 564, or were "manufactured," Locklin v. Day–Glo Color Corporation, 429 F.2d 873 (7th Cir. 1970). Thus if the hours spent litigating unsuccessful claims are reasonably related to the primary thrust of the plaintiffs'

cause of action, we will not deny fees for these hours. We will, however, take into account unsuccessful claims in setting the total amount of fees. See Swanson, supra at 563.

Under the foregoing test, we believe that all of the hours challenged by IDC are compensable. We agree with IDC that plaintiffs did not obtain any relief on the first three transactions. Nevertheless, time spent on the first three transactions was clearly related to the relief plaintiffs sought with respect to the fourth and fifth transactions. Moreover, an understanding of the first three transactions aided our resolution of the claims relating to the fourth and fifth transactions. Although we would be inclined to apply no multiplier to hours spent on the first three transactions, Swanson, supra at 563, we cannot determine from the present record how many hours were spent on those transactions. Furthermore, we do not believe that subtracting three–fifths of the hours from the hours eligible for a multiplier would be appropriate, because we have no basis for concluding that the time was divided equally among the five transactions. See Hughes v. Repko, 578 F.2d 483 (3d Cir. 1978). Thus rather than apply no multiplier to the hours on unsuccessful claims and a full multiplier on the remaining hours, we will apply a reduced multiplier to all of petitioners' hours devoted to the action prior to the appeal.

As for the hours spent on the motion for the redemption of preferred stock, we have denied the motion. But as we noted, a consideration of the redemption problem is relevant to the issue of reformation of the demand notes. Given the limited nature of the benefit from these hours, however, we will take these hours into account, along with those spent on the first three transactions, in reducing the multiplier.

As for the other hours challenged by IDC, we agree with petitioners that these hours had some indirect benefit to IDC. The hours spent on the motion for a temporary receiver may have had the effect of reducing IDC's opposition to plaintiffs' efforts.

The time consumed by motions to enjoin shareholders' meetings in 1976 and 1978 provided benefits related to the injunction against the 1976 reorganization proposal and the election of directors for IDC in 1978. Finally, because our denial of supplemental relief was reversed by the Court of Appeals, petitioners clearly should be compensated for the time spent on that motion before us.

■■■ IDC contends that hours spent by petitioners on the issue of fees are not compensable, because that time was spent solely on behalf of petitioners and in no way benefited IDC. Because the greater part of the fee award is to be assessed against IDC on the theory that plaintiffs' suit benefited IDC, IDC should not be forced to pay for hours devoted only to counsel's benefit. Analogizing this case to a fund recovery case IDC contends that petitioners here have a conflict of interest with the corporation they sought to benefit, just as attorneys who seek fees from a common fund have a conflict with the recipients of the fund.[13]

Petitioners respond that the weight of authority supports an award of fees for hours spent litigating the fee issue. Petitioners agree that the funds will come from the corporation that has been benefited. They contend, however, that this case is distinguishable from a fund case, because the relief here was equitable, and the value of the relief IDC received will not be diminished by an award to petitioners. In a fund case, according to petitioners, payment of fees results in an absolute and final reduction of funds available to the class or corporation. Here, however, the relief plaintiffs obtained will continue to benefit IDC and

the value of the stock will continue to grow solely as a result of petitioners' efforts. Petitioners also assert that the number of hours spent on the fee petition was inflated solely because of Heizer's and IDC's obstinacy in contesting fees. Petitioners contend that they should not be penalized for opposing counsel's "unconscionable" attempts to deny fees to petitioners.

We must first emphasize that petitioners are incorrect in their assertion that the weight of authority supports an award of fees for hours spent litigating the fee issue under the facts in this case. Of the seven circuit court decisions petitioners cite, all seven were civil rights cases. See Hairston v. R & R Apartments, 510 F.2d 1090, 1093 (7th Cir. 1975); Souza v. Southworth, 564 F.2d 609, 614 (1st Cir. 1977); Miller v. Amusement Enterprises, Inc., 426 F.2d 534, 539 (5th Cir. 1970); Rosenfeld v. Southern Pacific Co., 519 F.2d 527, 530 (9th Cir. 1975); Torres v. Sachs, 538 F.2d 10 (2d Cir. 1976); Gagne v. Maher, 594 F.2d 336 (2d Cir. 1979); Prandini v. National Tea Co., 585 F.2d 47 (3d Cir. 1978). Of the six district court cases petitioners cited, two were civil rights cases, see Aumiller v. University of Delaware, 455 F.Supp. 676, 688 (D.Del.1978); Stanford Daily v. Zurcher, 64 F.R.D. 680, 683–84 (N.D.Cal.), aff'd, 550 F.2d 464 (9th Cir. 1977), and one was a non–class action antitrust case in which the court assessed fees against the defendant. See Pitchford Scientific Inst. Conf. v. Pepi, Inc., 440 F.Supp. 1175, 1179–80 (W.D.Pa.1977).[14] In all of these cases, the fees were to be assessed against a wrongdoing defendant, not against the party benefited by the litigation. Like the courts in the cited cases, we have in a civil rights context awarded fees

---

**13.** IDC's argument does not and could not apply to hours spent on the issue of assessment of fees against Heizer. These hours clearly inured to IDC's benefit.

**14.** The other three cases cited by plaintiffs were Munsey Trust v. Sycor, 457 F.Supp. 924, 928 (S.D.N.Y.1978); Entin v. Barg, 412 F.Supp. 508, 516 n.16 (E.D.Pa.1976); and Sprague v. Ticonic Nat'l Bank, 110 F.2d 174, 177 (1st Cir. 1940). In Munsey Trust, the court refused to apply a multiplier for time spent on the fee petition and did not address the issue of wheth-

er fees should be denied entirely for such hours. In Entin v. Barg, the court relied on a civil rights case, Stanford Daily, supra, to justify an award for time spent on the fee petition, but reduced the amount sought. In Sprague, the Court of Appeals reversed the district court's determination that he had no authority to award fees for time spent seeking fees. The court then remanded for the district court to determine whether the court, in its discretion, should allow fees for such hours.

to counsel for time spent seeking their fees. *See Urbina v. Quern*, 482 F.Supp. 1013, 1016 (N.D.Ill.1980). Civil rights and antitrust cases, however, are inapposite to the question of whether counsel has a conflict of interest with the party sought to be benefited by the litigation and against whom fees are to be assessed. *See id.* at 1016 n.1. An award of fees in a civil rights case in no way diminishes the plaintiff's recovery.

In a fund case, however, an award of attorney's fees will reduce the fund and therefore the relief to the derivative plaintiff. *See Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 110–11 (3d Cir. 1976). If time spent litigating the fee issue is solely for the attorney's benefit, then the attorney is in conflict with the corporation, the party that the derivative suit seeks to benefit. The theory underlying an award of fees in a derivative suit is that the corporation should compensate the attorneys for benefits the corporation received through the suit. Thus unless the corporation can be deemed to have received a benefit from hours spent seeking attorney's fees, the corporation should not be assessed fees for those hours.

Petitioners claim that the benefits they have obtained for IDC will continue to grow and continue to benefit IDC, but that the benefit in a fund case is more finite. We fail to see how this argument addresses the question of whether hours spent on attorney's fees issues benefited IDC. Petitioners' argument, if true, merely shows that the relief they have obtained for IDC is of long–lasting duration and may be difficult to quantify. The only inference we can draw from this fact, however, is that fees awarded for hours spent on fees here may take a smaller proportional bite from the corporation's recovery than in a fund case. The bites may be of the same size, however, inasmuch as a corporation can find may uses for a fund recovered through litigation, and the corporation may receive through such a fund a benefit equally as significant or long–lasting as the relief obtained here. Even if petitioners' assertion is true, however, we do not see it as a

feature which distinguishes the fund cases from the instant case. In both cases, the effect of the corporation's recovery is diminished by a fee award. The proportion of the decrease and whether the fees come from the actual funds recovered in the litigation or from the corporate coffers are not relevant.

Hours spent litigating the issue of fees confer no direct benefit on the corporation. We can postulate an indirect benefit, however, because an obstinate defendant or an obstinate derivative plaintiff can, by vigorous and unjustified opposition to counsel's quest for fees, dilute the effect of any fee award. This would have the effect of discouraging representation in derivative suits. The danger of such a dilution is greater in a case such as this one in which the relief is equitable. Because the benefit from the relief obtained in such a case may be speculative, the defendant and the corporation may have more of a basis for challenging the benefit than in a fund case. Indeed, in the instant case petitioners have had to spend considerable time establishing their right to fees.

Our examination of petitioners' affidavits indicates that they clearly devoted 395 hours to the issue of fees. For an additional 271.75 hours, which IDC refers to as "unapportioned" hours, the entries indicate that some, but not all, of the listed hours were spent on the fee issue. Although IDC argues that none of the 271.75 hours are compensable, it would be unreasonable to deny petitioners fees for all of these hours. Moreover, although IDC claims that hours petitioners spent on the issue of assessing fees against Heizer were clearly delineated as such, we cannot be so certain. Thus even some of the 395 hours may have been consumed by the clearly compensable task of assessing fees against Heizer. In any event, plaintiffs have devoted at the most 666.75 hours to the issue of fees. Thus the dilution by total fees resulting from a denial of fees for attorney's fees issues would be approximately 12.6%. In litigation of this scope and complexity, the need to spend an uncompensated 12.6% of the total hours on

attorney's fees would probably not be a disincentive to undertaking the suit.

We conclude, however, under the facts of this case, that the hours spent on attorney's fees should be included in the total number of hours. In assessing fees for those hours the 666.75 hours will be a part of the 25% of the total that we have found Heizer obligated to pay. We reach this conclusion in part because much of the dilution which would result from a denial of fees on the attorney's fee issue is a result of Heizer's efforts. The battle as to the benefit to IDC was waged primarily by Heizer. More importantly, petitioners do not have the same conflict of interest with respect to the fees assessed against Heizer as they do with respect to IDC, because fees paid by Heizer do not come from the party petitioners sought to benefit with this litigation. The civil rights cases cited by petitioners are more analogous here, inasmuch in both situations a wrongdoing defendant is liable for fees. We have found that Heizer acted in bad faith and did so in a method calculated to frustrate the entire litigation. We believe it fair that Heizer pay for petitioners' costs in seeking their fees.

This beings us to the issue of petitioners' recordkeeping. IDC claims that some of the hours are improperly documented. Petitioners need not list their hours with "mathematical precision." *See Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). Rather, plaintiffs have satisfied their burden of proof if they demonstrate that "the hours claimed by counsel in their affidavits are a rational reflection of the services performed." *Cruz v. Beto*, 453 F.Supp. 905, 908 (S.D.Tex.1977). *See also Lindy Bros. Builders of Philadelphia v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 167 (3d Cir. 1973); *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 473 (2d Cir. 1974); Moreover, one method that the court may employ in determining fees is its own observation of petitioners' efforts. *Cruz, supra.*

Under this standard, we believe petitioners have satisfied their burden of proof on this issue. Petitioners have justified, either through contemporaneous time records or independent recollection, the various hours they claim. When these methods of calculating hours are buttressed by our independent observation of petitioners' efforts in this protracted litigation, we believe that no more is required of them. Although petitioners could avoid disputes regarding hours and make our job easier by keeping more accurate records, we will not, at least in this case, deny them fees for failing to do so. We will not lengthen an already lengthy opinion by considering separately each diary entry challenged by IDC. Petitioners have sought to justify each group of hours questioned by IDC. We have reviewed petitioners' justifications and we credit them. Moreover, we have reviewed the time spent by petitioners and find the number of hours devoted to this case to be reasonable. Therefore, petitioners are entitled to fees for 3,695 hours at $90 per hour, 498.5 hours at $95 per hour, and 1,091.75 hours at $100 per hour, for a total of 5,285.25 hours and a lodestar of $489,082.50.

We must now determine whether a multiplier should be applied to the lodestar. We will first decide whether IDC will pay a multiplier and then whether the fees Heizer owes will be subject to a multiplier. Two broad issues govern the determination of whether a multiplier is appropriate: the contingent nature of the litigation and the quality of the attorneys' services. *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974). Within these broad issues are subissues. Relevant to a determination of the contingent nature of the case are the risk of litigation and the delay in receipt of payment. *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102 (3d Cir. 1976) (Lindy II). The quality of the attorneys' services is an even broader issue and is measured by the benefit conferred upon the corporation, the magnitude of the case, the skill and experience necessary to succeed in the litigation, and the efficiency of the attorney's efforts. *See id.* at 117–18.

In the instant case, we have already noted that the benefit conferred on IDC is

speculative and that although this uncertainty does not warrant a denial of fees, the extent of the multiplier should reflect the speculative nature of the benefit. We are therefore reluctant to impose any multiplier on the basis of benefit conferred on IDC. Moreover we have also recognized that no multiplier should be imposed on hours spent on unsuccessful claims. Because we could not isolate those hours, we held that the multiplier for all hours should be reduced. We also agree with IDC that this is not a case of great magnitude. The suit benefits a privately-held corporation, with relatively few stockholders. This is not a case in which petitioners recovered a huge fund for the benefit of a large class of injured parties. *See, e. g. In re Equity Funding Corp. of America, Securities Litigation*, 438 F.Supp. 1303 (C.D.Cal.1977) (involving $60,000,000 settlement fund).

In assessing the skill and efficiency demonstrated by plaintiffs' counsel, we note first that to a great extent petitioners' skill and experience are reflected in their hourly rate. Unless petitioners demonstrated quality work above that common for lawyers who charge their hourly rate, then no multiplier on that basis is appropriate. Thus only exceptional services justify a multiplier. *See Lindy II, supra*, 540 F.2d at 117–18.

Petitioners' hourly rate already bespeaks considerable skill and experience. They did excellent legal work in this case, but we would expect that from attorneys billing $90 to $100 per hour. Moreover, plaintiffs were unsuccessful as to the first three transactions, and although the Court of Appeals decision revealed a novel theory of liability, we are not certain that petitioners can take credit for that theory. Thus we are not inclined to award a multiplier solely on the basis of petitioners' skill.

As for efficiency, we note that petitioners did perform many tasks which could have been performed by other attorneys with less experience and a consequent lower hourly rate. *See Equity Funding, supra* at 1330. Although we are not inclined to reduce for this reason petitioners' hourly rate for those tasks, as IDC urges, we do believe this use of time is relevant in determining whether petitioners' efficient prosecution of the case warrants a multiplier. In light of all of the circumstances, we will not increase petitioners' award on the basis of quality of services.

The other issue is the contingent nature of the case, and here the petitioners have a much better argument. Because attorneys are never guaranteed success in a particular case, despite vigorous and competent efforts, the normal hourly rate may not be adequate compensation. The complexity of the case, the probability of defendant's liability, the difficulty of proof, the risks inherent in developing the case, and the delay in receipt of payment are all factors impacting on the contingency. *See Lindy II*, 540 F.2d at 117. To a certain extent, the contingency factor reflects the fact that counsel must receive a premium to allow them to continue to undertake representation in contingency cases, in some of which they will be unsuccessful and receive no fees.

This is a complex case. Plaintiffs had to introduce evidence on a complicated series of transactions and to prove 10b–5 violations in the face of constantly changing law. For this same reason, the probability of Heizer's liability was dubious, and the plaintiffs were not assured of obtaining any relief for IDC. No prior proceedings shed any light on Heizer's liability, and the case law revealed no clear answers. Finally, petitioners had to wait over six years to receive any portion of their fees and have seen the value of the dollar decline in the process.[15]

---

**15.** Inherent in the delay factor is the effect of inflation. In calculating the multiplier we will take into account the rate of inflation. The petitioners have urged us to do so even before their recent motion tailored specifically to the inflation rate. Therefore we are somewhat at a loss as to the purpose of this motion. If petitioners want us to recognize inflation as a factor increasing the multiplier, we are doing so. To a certain extent, of course, the increase in petitioners' hourly rate also reflects this inflation factor. *See* Tr. 869.

In light of these factors, we believe that the contingency factor justifies a multiplier. Although plaintiffs' success became more certain after appeal, we will nevertheless award a multiplier to petitioners for post–appeal hours. The delay factor is still significant for these hours. Furthermore, the contingency factor impacts upon counsel's decision to undertake representation. Representation may include substantial expenditures of time even after success is assured, but counsel cannot know that prior to his decision to take the case. Therefore although petitioners are not entitled to the same multiplier for post–appeal hours, they will receive some multiplier to compensate for the contingency factor. We hold that a 1.75 multiplier would be appropriate for pre–appeal hours assessed against IDC, which we will reduce to 1.5 to take into account petitioners' lack of success on the first three transactions. For post–appeal hours we will award a 1.33 multiplier. This figure does not have to be reduced inasmuch as plaintiffs did not appeal our rulings with respect to the first three transactions.

Heizer contends that even if petitioners are entitled to fees from Heizer, no multiplier on those fees would be appropriate. Heizer found no cases, nor did we, that indicate that application of a multiplier is appropriate in a bad faith case. We see no reason, however, why we cannot award a multiplier against Heizer here simply because the fee award is premised on a theory of bad faith. The factor justifying a multiplier in the instant case, the contingency factor, does not vary with the identity of the party liable for fees. Moreover, courts have awarded multiplied fees in cases in which a wrongdoing defendant, and not a benefited class or corporation, is liable for

the fees. *See e. g. Commonwealth of Pennsylvania v. O'Neill*, 431 F.Supp. 700 (E.D.Pa. 1977) (suit under § 1981 and Title VII). Furthermore, if Heizer were not liable for any fees, IDC would be forced to pay all of petitioners' fees, with a multiplier.[16] Petitioners should not suffer a loss by virtue of their successful efforts to assess fees against Heizer.

However, a multiplier should not be applied to the hours spent on the attorney's fee issue. Given the fact that these hours were in significant part devoted to petitioners' interest, straight compensation for those hours is sufficient.[17]

Thus the fees will be assessed as follows: Heizer is liable for $153,719.31. To arrive at this figure, we began with the premise that Heizer is liable for 25% of the hours spent at each of the three hourly rates: 923.75 at $90 per hour, 124.5 at $95 per hour and 272.9 at $100 per hour. Because only Heizer is liable for the hours spent on attorney's fee issues, we then determined how many hours at each hourly rate were devoted to the fee issues. We found that petitioners spent 61.5 hours at $90 per hour, 104 hours at $95 per hour and 501.25 hours at $100 per hour on the fee issue. Because petitioners spent far more time in the latter stages of the litigation on the fee issue, a straight 25% apportionment in the three hourly rates would not work. Therefore, we subtracted 228.35 hours from the 923.75 hours in the $90 per hour group and added 228.35 hours in the $100 per hour group to raise the number of hours in the $100 per hour group to the required 501.25. We then had a total of 695.4 hours at $90 per hour, with 61.5 spent on the fee question, 124.6 at $95 per hour with 104 devoted to the fee issue, and 501.25 at $100 per hour, all devoted to the fee issue. The final figure is computed as follows:

---

**16.** IDC would have to pay all fees except those for hours devoted to the fee petition.

**17.** We noted previously that with respect to 271.75 hours, petitioners worked on several issues, including the attorney's fee issue, and we have no way of determining what proportion of these 271.75 hours was devoted to the fees issue. Although we would not be inclined to deny petitioners any fees for these hours were

we to find hours spent on fees to be noncompensable, we will not impose a multiplier on any of these hours. We decline to engage in the guesswork necessary to apportion the hours between fee and nonfee issues. Thus petitioners, who are the ones responsible for maintaining the time records, should be the ones to suffer for the vagueness of those records.

$$633.9 \times \$90 = \$57,051 \times 1.5 \text{ (multiplier)} = \$85,576.50$$
$$61.5 \times 90 = 5,535.00$$
$$20.6 \times \$95 = \$1,957 \times 1.33 \text{ (multiplier)} = \$2,602.81$$
$$104.0 \times 95 = 9,880.00$$
$$501.25 \times \$100 = \$50,125.00$$

| | Total | $153,719.31 |
| --- | --- | --- |

IDC's liability is determined by taking the hours remaining for each hourly rate and multiplying these by the hourly rate and the appropriate multiplier:

$$
\begin{array}{r}
3,695 \\
- \ 695.4 \\
\hline
2,999.6
\end{array}
\text{(hours)} \times \$90 = \$269,964.00 \times 1.5 \text{ (multiplier)} = \$404,946.00
$$

$$
\begin{array}{r}
498.5 \\
- \ 124.6 \\
\hline
373.9
\end{array}
\text{(hours)} \times \$95 = \$35,520.50 \times 1.33 \text{ (multiplier)} = \$47,242.26
$$

$$
\begin{array}{r}
1,091.75 \\
- \ 501.25 \\
\hline
590.50
\end{array}
\text{(hours)} \times \$100 = \$59,050.00 \times 1.33 \text{ (multiplier)} = \$78,536.50
$$

| | Total | $530,724.76 |
| --- | --- | --- |

IDC has already paid $375,000 to petitioners and is now liable only for $155,724.76.

### 3. *Other Fee Petitions*

In addition to the fees sought by Messrs. Slovick and Gordon, we have pending fee petitions submitted by A. Bradley Eben, Michael Rosenhouse, and J. Samuel Tenenbaum and Theodore Becker. Eben assisted Slovick and Gordon in opposing the petition for a writ of certiorari in the Supreme Court. He seeks fees for 35.5 hours at a rate of $125.50 per hour with a multiplier of 1.5 for a total fee of $6,656. We are convinced that petitioner Eben's work was of benefit to IDC for the reasons we have previously discussed and that the time records and affidavits are sufficient under the standards we have enunciated. Therefore, we will award fees to Eben at the rate of $125.50 per hour for 35.5 hours. A reduction in the multiplier Eben seeks is appropriate in order to reflect the reduction we made in the multiplier proposed by Slovick and Gordon. Therefore, we will apply a 1.15 multiplier to Eben's time, for a total fee award of $5,123.50. IDC will pay $3,842.62 and Heizer will pay $1,280.88.

Rosenhouse aided Slovick and Gordon on a variety of issues for a total of 39.5 hours. He seeks fees at the rate of $50 per hour with a multiplier of 1.5, for a total of $2,962. We conclude that Rosenhouse is entitled to fees. We will apply the same 1.5 multiplier for Rosenhouse as for Eben and award fees in the amount of $2,271.25. IDC will pay $1,703.43 and Heizer will pay $567.82.

Becker and Tenenbaum aver that they spent 350.05 hours assisting Slovick and Gordon on the appeal and 73 hours subsequent to the appeal. We have no doubt that Slovick and Gordon required assistance in this complex litigation. Moreover we are not disturbed or surprised that Becker and Tenenbaum have a different view of their role in "strategy" than do Slovick and Gordon. Rather, we are satisfied that Becker and Tenenbaum rendered necessary and well-documented services and are entitled to fees. Becker and Tenenbaum seek a multiplier of 3 for pre-appeal hours and a multiplier of 2 for post-appeal hours. They undertook the representation with the same contingency factor as Slovick and Gordon. Therefore, they are entitled to a multiplier,

and we will apply multipliers proportional to the 1.5 and 1.33 applied to Slovick and Gordon's fees. Becker and Tenenbaum will receive fees for 350.05 hours at the rate of $75 per hour and a multiplier of 1.42 and for 73 hours at $75 per hour and a multiplier of 1.13 for a total of $43,467.07. IDC will pay $32,600.30 and Heizer will pay $10,-866.77.

### 4. *Bill of Costs*

Plaintiff Beneficial Standard Corp. (Beneficial) seeks reimbursement of its costs in the amount of $28,110.02. Both IDC and Heizer object to Beneficial's bill of costs on several grounds. First, Beneficial did not file its original bill of costs until January 6, 1976, thirty–four days after our final judgment was entered on December 3, 1975. Because local rule 45(a) requires prevailing parties to submit a bill of costs within 10 days of the entry of final judgment, IDC and Heizer contend that the bill is untimely. Second, IDC contends that Beneficial has failed to apportion the costs between its successful derivative claim and the unsuccessful individual claim. Finally, both parties contend that certain costs contained in the bill, such as travel expenses, telephone calls and "special secretary" expenses are noncompensable.

The various expenses listed by Beneficial are divisible into two categories. The first are taxable costs, such as printing fees and transcripts, contained in 28 U.S.C. § 1920. These costs are the costs that are deemed waived under local rule 45(a) if not submitted within ten days of final judgment. These costs would be assessed against the losing party, Heizer.

■ The other category of costs are expenses incidental to the plaintiffs' attorney's work, which would be assessed against IDC. The Supreme Court, in *Mills v. Electric Auto–Lite, supra,* recognized that litigation expenses disbursed by plaintiffs' attorneys in a derivative suit for the benefit of a corporation should be paid by the corporation. 396 U.S. at 392, 90 S.Ct. at 625. Because the corporation and its stockholders benefit from the litigation, they should

share in the expenses related to the litigation. The expenses of litigation include not only attorney's fees, but the expenses that those attorneys incur that would normally be paid by the client. *See Bailey v. Meister–Brau, Inc.,* 535 F.2d 982 (7th Cir. 1976). In another case we held that attorney's fees, even if considered part of the costs, are not encompassed within local rule 45(a). *Independent Voters of Illinois v. Chicago Housing Authority,* No. 76 C 3683 (unpublished Memorandum Opinion, January 31, 1979). We held that only costs encompassed by § 1920 are waived by the failure to file a timely bill of costs. Thus attorney's fees, and their expenses, would not be covered by the rule.

■ Beneficial could argue that even taxable costs should be components of attorney's fees recoverable as part of the fee award. Allowing such costs to be taxed against IDC, however, would nullify the commands of rule 45(a). Moreover plaintiffs would then be able, through neglect, to fail to assess costs against Heizer but nevertheless receive the costs from IDC, the corporation plaintiffs were trying to benefit. Therefore Beneficial is entitled as part of the attorney's fee to reasonable nontaxable expenses incurred by its attorneys. Beneficial, however, is not entitled to reimbursement for costs taxable under § 1920 unless a timely bill of costs was filed.

In determining the reasonable nontaxable expenses, we must determine whether Beneficial properly apportioned the costs between its successful derivative claim and the unsuccessful individual claim. At the hearing, Gordon testified that he and Slovick recorded separately the costs related to Count 3, the individual claim. Tr. 1021. Moreover, he testified that the costs related to Count 3 were minimal inasmuch as Count 3 was dormant for most of the period reflected in the bill of costs and was severed prior to trial. Tr. 1031–32. We credit this testimony and we find the nontaxable costs listed by plaintiffs to be reasonable. Therefore, IDC is liable for Beneficial's costs in the amount of $713.50 for telephone expenses, $5,017.70 for trial expenses, $408.28

for special secretary fees, $1,608.15 in miscellaneous expenses, and $3,560.00 in witness fees, for a total of $11,307.63. The witness expenses constitute the portion of witness fees not taxable under 28 U.S.C. §§ 1920 and 1821.

■ As for costs taxable under § 1920, we must first determine whether Beneficial submitted a timely bill of costs. Plaintiff's bill of costs reflecting expenses through the trial, filed on January 6, 1976, was not timely. After the Court of Appeals issued its mandate on September 21, 1977 ordering us to modify our decree, plaintiff on September 30, 1977 submitted a timely motion for an extension of time within which to file its bill of costs as permitted by local rule 45(a). We granted this motion, and plaintiffs submitted their bill of costs on October 11, 1977. Three possible results appear from this set of facts. First, plaintiffs are entitled to all taxable costs contained in the bill, because timely filing of their bill of costs following the Court of Appeals' mandate cured the defect of plaintiffs' failure to file timely the original bill. Second, plaintiffs' failure to file the original on time waives all taxable costs up until that time, but any subsequent costs may be taxed against Heizer. Third, plaintiffs' failure to file a timely bill after trial waived all costs, including those subsequent to January 6, 1976.

The parties have not presented us with any law on this issue, nor has our own search revealed any. We hold, however, that the second result, allowing plaintiffs to recover only those costs for expenses incurred subsequent to the date the original bill should have been filed, December 13, 1975 is the most reasonable construction of local rule 45(a). A final judgment was entered in the case and Beneficial was clearly the prevailing party entitled to costs as a matter of course under F.R.Civ.P. 54(d). Therefore, plaintiffs had a duty to file a bill of costs within 10 days or waive the right to those costs. The rule makes no provision for postponing the filing of a bill in the event of an appeal. The rule obviously contemplates the filing of a bill of costs without regard to whether an appeal is filed because the bill is due twenty days before a notice of appeal may be filed. Moreover, we see no reason to excuse plaintiffs' failure to file merely because our judgment was modified on appeal. Our decision was basically affirmed, and the modifications relate to requests for supplemental relief made subsequent to January 6, 1976. So long as plaintiffs prevailed at trial, they were obligated by Rule 45(a) to file a bill of costs within ten days. This obligation would not vary if the judgment were affirmed or affirmed with modifications.

On the other hand, plaintiffs have not waived costs incurred subsequent to January 6, 1976. Any request for such costs made prior to that date clearly would have been premature. Moreover, the rule cannot be read to require waiver of future costs, particularly when many of the additional costs were necessitated by the modifications made by the Court of Appeals of our judgment. Therefore, Beneficial is entitled to reimbursement from Heizer of taxable costs expended after January, 1976, provided the bill of costs properly records those costs.

Beneficial is clearly entitled to the $115.00 in court costs, $1,261.15 in printing costs, and $1,239.15 incurred as printing expenses on appeal. As for the witness expenses, Beneficial is limited by 28 U.S.C. § 1821 to $30 per day of testifying and expenses. Thus Heizer is liable for $101.25 in witness costs. As for the $787.15 for transcripts, and $2,281.71 for copying costs, plaintiff's bill is deficient. Under § 1920, only costs for transcripts necessary for use in the case are taxable, and local rule 45(b) provides that only the cost of the original at regular copy rates is taxable. The cost of copies and extra charges for daily rates are not allowable. Plaintiff's bill does not indicate how the transcript fees were computed. In fact, two invoices from our court reporter, dated June 10, 1976 and June 21, 1976, totalling $92.50 apparently appear on the bill of costs as billed to Beneficial on June 22, 1976. *See* Plaintiff's Exhibits 14 and 15. This $92.50 charge was based on an

expedited delivery rate. Similarly, copying expenses are taxable only if the copies were necessary for use in the case. Plaintiff has made no effort to justify any of the copying charges. Heizer and IDC have objected to the vagueness of Beneficial's bill of costs, but plaintiff has made no effort to cure the defects or resolve ambiguities. We are not going to wade through the various invoices submitted by plaintiff. We hold that plaintiff Beneficial is not entitled to costs for copying expenses or for transcript fees.

## ADJUSTMENT OF MATURITIES OF DEMAND NOTES

■ Two experts testified with respect to the modification of the demand notes. William Browning testified on behalf of Heizer and Donald Crossett gave IDC's position. Plaintiffs, content to derive their positions from the Browning and Crossett testimony, presented no expert witness. We cannot adopt without change either expert's proposed schedule, because recent events necessitate several modifications. First, both schedules contemplated that repayment would commence in 1978. Second, neither schedule made any provision for attorney's fees, and we have now held that IDC is liable for $205,178.74 in attorneys' fees in addition to what it has already paid. Third, in October, 1979, Heizer tendered 92,952 shares of preferred stock in exchange for 276,223 shares of common stock. This transaction necessitates modification of the preferred stock redemption portion of the schedules. We will first consider which of the two schedules is preferable and then make the necessary modifications.

To derive his schedule, Crossett first projected IDC's income through 1992. He based his projections for 1978–1982 on IDC's 1978 Business Plan. See Heizer Exhibit 7. From 1982 to 1992 he projected yearly 10% growth. Based on these projections, Crossett concluded that IDC would be able to repay Heizer by 1992. In calculating what IDC would be able to pay each year, Crossett applied a yearly 35% discount to the projected income as a cushion to provide for fluctuations or inaccuracies in the projections. To arrive at this 35% cushion, Crossett first applied a 7% reserve for unanticipated capital expenditures. He then applied a discount factor to each of three categories of IDC's businesses. For TR, the most successful of IDC's enterprises and the projected provider of 46% of the total revenues, Crossett applied a 15% discount factor. For the West Coast operations, projected to account for 34% of total revenues, Crossett arrived at a 25% discount. For the "New Businesses," whose uncertain future rendered the projections of 20% of total revenue speculative, Crossett applied a 50% discount. Tr. 231–34. He then arrived at a weighted discount of 28% by multiplying the percentage of revenues for each entity by the discount factor, adding these figures, and dividing the total by the total discount factor:

| Entity | % of Revenue × | Discount Factor | Discount Factor Weighted |
|---|---|---|---|
| TR | 46% | 15% | 690 |
| West Coast | 34% | 25% | 850 |
| New Businesses | 20% | 50% | 1,000 |
| | 100% | 90% | 2,540 |

$$2,540 \div 90\% = 28\%$$

See IDC Exhibit 3, Tr. 234–38. This 28% discount was added to the 7% capital expenditure reserve to arrive at the 35% cushion. Crossett maintained that application of the 35% cushion would be necessary throughout the repayment years. Even though in the later years the newer businesses would be more mature, this stabilizing effect would be offset by the increased uncertainty of projecting income for distant years. Tr. 444. Because the prime plus 2½% notes require greater interest payments than the 7.75% notes, IDC proposed the repayment of the prime plus 2½% notes first.

The Crossett plan would permit prepayment of the loans out of "excess cash" if such prepayment would not substantially affect IDC. IDC derived a formula for determining whether IDC had excess cash. See IDC Exhibit 8.

IDC contends that default consequences attaching to IDC's failure to pay any of the scheduled repayments would be in contra-

vention of the Court of Appeals mandate. The mandate requires IDC to repay the loans only as it is able to do so, and thus any failure to pay indicates an inability to repay for which IDC may not be penalized. IDC, however, recognizes that the mandate does not permit us to convert the debt to Heizer into equity and so proposes that in the event of an inability to pay on schedule, IDC must petition the court for further modification of the schedule.

Heizer's expert, Browning projected IDC's income through 1986 and concluded that IDC should be able to repay the debt by then. For the years through 1982, Browning relied on the IDC Business Plan's projection. For the years 1982–1986, he used an econometric model to project 8 to 9% growth for IDC. See Heizer Exhibit 22B. Like Crossett, Browning, recognized that the projections may not be reliable and that some cushion is necessary. Browning's proposed cushion, however, is non–cumulative. Under Browning's plan IDC could defer payment of up to $1,000,000 of principal to the end of the schedule. Once a million dollars in payments had been deferred, however, the cushion would be gone and default consequences would ensue from a failure to pay on schedule. See Heizer Exhibit 22A, p. 4.

Browning built other cushions into his schedule. The first would take into account the fluctuating prime rate applicable to the prime plus 2½% loans. If any interest payment exceeded the amount projected in the repayment schedule because the actual prime rate exceeded the 8¼% figure projected, the after tax cash value of that amount could be deferred to the end of the payment schedule. Tr. 585. The Browning schedule also allocated $5,639,122 for working capital and capital expenditures during 1978 to 1984. According to Heizer, this amount is twice the amount needed. Tr. 1507. Third, $1,295,000 is allocated by Browning for management's profit–sharing. This figure could be reduced if IDC's

profits fall short of projections. Finally, IDC's regular bank balance of $2,000,000 is a further cushion that Browning had not used in formulating his plan. Tr. 591–92.

Heizer maintains that the notes must remain debt both to comply with the mandate and to prevent adverse tax consequences. Heizer argues that if we do not impose default consequences, the notes will become equity, and IDC will lose the tax deduction for the interest payments on the loan. Tr. 1508. Moreover, Heizer contends that the Court of Appeals refused to convert the debt into equity, and that therefore the mandate requires us to impose default consequences.

Heizer has also proposed that additional terms be added to the demand notes besides terms related to the maturities of the notes. These new terms, according to Heizer, are necessary to protect both IDC and Heizer by ensuring repayment according to the schedule.[18] See Heizer Exhibit 22A. Heizer has also proposed that we create from the amount of interest IDC owes Heizer new "accrued interest" notes, which would themselves accrue interest.

Plaintiffs have not submitted a schedule. Rather, they originally proposed a formula, pursuant to which the debt would be repaid. The formula would take operating income; subtract interest owed to Heizer, interest on non–Heizer debts, and income taxes; and then add back "non–fund charges," such as depreciation to arrive at "funds from operations." Then cash needed for additions to working capital and capital expenditures would be subtracted from this figure to arrive at the funds available for the retirement of the debt. Then, IDC would satisfy obligations to creditors other than Heizer, and the balance would be applied to the Heizer notes. Thus if in a particular year no funds were available to pay Heizer, Heizer would receive nothing that year.

Plaintiffs have now stated that they would accept a fixed schedule so long as no

18. We will consider these individual terms after we have determined whether we are empow- ered to add such terms.

default consequences ensue from a failure to meet the scheduled payments. If a schedule were imposed, plaintiffs contend that any deficiency in payment should be added to the next year's payment. Plaintiffs insist that the Court of Appeals mandate requires that no adverse consequences be imposed upon IDC as a result of its inability to pay. Moreover, they dispute the ability of Browning and Crossett to determine with specificity what IDC will be able to pay in any given year.

Plaintiffs argue that even if the failure to impose default consequences results in the loss of an interest deduction, that loss would not impair IDC's ability to pay. Furthermore, plaintiffs argue that the loss of an interest deduction would be sheltered by IDC's tax loss carryforward. Finally, plaintiffs contend that any opinion by this court on the tax consequences would constitute an improper advisory opinion.

> The Court of Appeals opinion states that [I]n order to unravel in an equitable manner the transactions resulting from Heizer's wrongful conduct, the maturities of the loans should be adjusted to make them commensurate with IDC's ability to pay. On remand the District Court should make the necessary determinations and modify the terms of the loans accordingly.

560 F.2d at 254. In a footnote, the court noted that this relief does not seem unduly harsh, because IDC's monitoring program had been dropped and TR had always been growing and profitable. With TR's earnings sheltered by IDC's loss carryovers, the court opined that IDC should be able to pay back the loans eventually. 560 F.2d at 254 n.15. In reaching its conclusion to order modification of the demand notes the court reasoned that the loans should not be subordinated unless Heizer had acted unfairly either by continuing the monitoring business or by extending loans rather than contributing equity capital. The court could not find that Heizer's continuation of the

monitoring business, involving risk to itself as well as other shareholders, was unfair to the corporation. The court also noted that state law does not require a fiduciary to provide financing only by means of an equity investment. Thus the court considered only whether the terms of the loans were fair. The court characterized the loans as a "heads–I–win–tails–you–lose series of transactions" inasmuch as Heizer could obtain a large share of IDC's equity if the monitoring venture was successful and promptly recoup its investment by calling in the loans if the monitoring failed. Finding that the loans were unfair to IDC, the court ordered the demand feature of the notes modified.

We have carefully repeated the Court of Appeals' analysis, because our modification of the terms of the demand notes must be consistent with that analysis. Thus on the one hand, the notes must remain debt; we cannot so alter the terms of the notes so as to force Heizer to participate as an equity investor in the risks of IDC's business. On the other hand, any maturity date we impose must be commensurate with IDC's ability to pay. The Court of Appeals contemplated that repayment might take a substantial period of time and that IDC's ability to pay was the sole criterion governing the length of the period.

Plaintiffs have abandoned their objections to the imposition of a fixed schedule. The Court of Appeals ordered us to adjust the maturities of the demand notes, and we can do that only through the use of a fixed schedule. We conclude that the schedule submitted by Crossett is the better of the two submitted. In reaching this conclusion we have considered the projections of future income, the proposed cushions, and the application of the funds available for repayment.

None of the parties dispute that IDC's management is skilled at projecting the corporation's future income.[19] IDC undertakes a careful study of it performance every

---

**19.** Browning relied on the 1978 Business Plan in formulating his projections. *See* Tr. 543. Plaintiffs characterize Browning's projections as "highly reliable." *See* Plaintiffs' Post–Trial Brief at 69.

year and makes a thorough study of projected future growth. Tr. 190. Heizer Exhibit 7. Crossett based his projections for the initial years on IDC's 1978 Business Plan. Although Heizer contends that Crossett's prediction of 10% annual growth is arbitrary, the figure is not materially different from the 8% to 9% growth projected by Heizer, given the vagaries of projecting income several years in the future. Crossett testified that the 10% figure was a conservative estimate for the years 1983 to 1992, given the 28% growth projected for 1978 to 1982. Tr. 227. Thus we find that the income projections contained in the Crossett schedule to be reasonable and reliable enough to form the basis of a repayment schedule.

The 35% cushion IDC proposed is more in line with the Court of Appeals mandate than cushions provided by Heizer, the most important of which is the right to defer $1,000,000 in payments until the end of the schedule. Although we must rely on projections in setting a schedule, we cannot be unmindful of the difficulty in making such projections with any degree of accuracy. Therefore IDC, which has the right to repay only as it is able, should be protected against the danger that the projections do not accurately reflect their ability to repay. Moreover, Crossett noted that the 1978 Business Plan, upon which he and Browning based some of their projections, represented "objectives," as well as predictions of the corporation. Tr. 190. It is thus a "leadership document which is designed to stretch the capabilities of the organization and is not a financing plan." Tr. 477. The $1,000,000 cushion Heizer proposes is cumulative; IDC could therefore lose any protection against an incorrect projection long before the end of the schedule. IDC's proposed cushion, however, provides continuing protection to IDC for the life of the schedule and cushions every projection.[20] Crossett derived the 35% cushion by discounting the performance of IDC's various businesses in line with their maturity and by weighting the resulting figures in line

with the size of those businesses. *See* Tr. 228–243. This derivation is a credible method of allowing for variance in the different businesses that IDC is engaged in and for the effect that those variances would have on the projections. In addition, the 7% reserve for unanticipated capital expenditures, which is a part of the 35% cushion, is a necessary element of any procedure for guarding against unforeseeable expenses.

The other cushions mentioned by Browning will not be lost if we adopt Crossett's plan. The $2,000,000 IDC keeps for working capital will still be available. Heizer perceived a cushion in its liberal prediction of capital expenditures: $5,639,122 for the years 1978 to 1984. IDC's schedule allocates $6,276,000 for capital expenditures in the same period. *See* IDC Exhibit 1. IDC can reduce profit sharing if necessary. Finally, Heizer provided a cushion to guard against an increase in the prime rate over the rate projected for interest on the prime plus 2½ notes. Because the IDC cushion will remain in effect in each year of the schedule, IDC should be amply protected from fluctuations in the prime rate. *See* Tr. 261–62.

As for application of available funds, Browning and Crossett agree that the most expensive debt should be retired first. The Crossett schedule, however, provides for a buildup of cash remaining at each year end so that when IDC has a positive shareholder equity it will be able to begin redeeming the preferred stock held by Heizer. Heizer objects to this aspect of the repayment schedule, contending that IDC needs to improve its debt/equity ratio before reducing its equity through redemption of preferred stock. Heizer also contends that IDC should begin to pay off the demand debt and thereby reduce the interest payments before it redeems the preferred stock. *See* Tr. 541–42.

IDC has a contractual obligation to redeem the preferred stock as soon as the

---

**20.** Adoption of IDC's proposed cushion is particularly appropriate in light of our conclusion *infra* regarding default consequences attaching to the term notes.

shareholder equity becomes positive. *See* Certificate of Amendment of Certificate of Incorporation of IDC, Appendix D to Heizer Post–Hearing Brief. Crossett testified that he created the sinking fund as part of the repayment schedule because the Board of Directors has the obligation to redeem the preferred stock when the equity becomes positive, and he thus considered this obligation as an element affecting IDC's ability to repay the loans. Tr. 386. We held earlier that we do not have the authority to order IDC to redeem the preferred stock. Likewise, we do not have the authority to order IDC to violate its contractual obligations in order to postpone redemption of the preferred stock, particularly in light of Heizer's failure to waive fulfillment of the obligation to redeem.[21] The redemption of preferred stock is an obligation affecting IDC's ability to pay, and we are not empowered by the mandate to alter that obligation.

Moreover, a failure to redeem when the equity becomes positive triggers an increase in the preferred dividend from $0.82 to $1.20 per share. Although IDC's assertion that this would make the dividend on preferred more costly than the projected 9.3% interest on the prime plus 2½ notes is somewhat less persuasive given the current prime interest rates, we cannot be certain what the prime rate will be in 1983, when IDC is scheduled to begin redemption. Moreover, unlike preferred dividends, the interest on the loans is deductible for income tax purposes. Because IDC is taxed at approximately 50%, IDC will probably reduce its overall cost by redeeming the preferred stock first.

In addition, Heizer's argument regarding IDC's debt/equity ratio loses some force in light of Heizer's exchange of almost one–third of its preferred stock in return for common stock. This exchange not only increased IDC's equity by the amount of the accrued dividends on the preferred, but it also converted some of the shareholder equity from stock that would ultimately be redeemed to stock which will not. The transaction also reduced by one year the number of years necessary to redeem the preferred stock, thereby advancing the repayment of principal on the notes by a year.[22]

Finally as for the projections of working capital needs and capital expenditures, we will not require IDC to obtain a working capital loan so that it may use the $2,000,-000 cash to repay the Heizer loans. We also find that the 1978 Business Plan is reliable, and thus we will rely on the projections derived by that plan with respect to funds needed for capital expenditures. Thus we find the Crossett plan preferable, and we will use that schedule in modifying the maturities on the notes.

We now turn to the issue of whether default provisions should be a part of the reconstructed notes and if so, what additional terms should be added to the notes. The Court of Appeals held that the debt must remain debt. Under either plaintiffs' or IDC's proposal, the notes would bear little resemblance to debt. Under the plaintiffs' proposal, IDC would be able to take as long as necessary to pay off the notes. Moreover, IDC's proposal would have essentially the same effect. According to IDC's proposal, if the corporation was unable to meet the schedule, it would petition the court for further modification. IDC has not indicated what form this further modification would take, but we assume that it would entail an extension of the schedule. Under either IDC's or plaintiffs' proposal, therefore, Heizer would essentially lose the most important aspect of any debt transaction: the right to collect. *See Sherwood Memorial Gardens v. Commissioner of Internal Revenue*, 350 F.2d 225, 226–28 (7th Cir. 1965); *Portage Plastics Co. v. United States*, 470 F.2d 308, 312 (7th Cir. 1972).

If we do not impose default provisions, Heizer would be forced to participate in the risk of IDC's business; if IDC never had

---

**21.** We do not consider arguments by Heizer's counsel as a waiver of Heizer's rights with respect to the preferred stock.

**22.** *See* Repayment Schedule *infra*.

any money to repay to Heizer, then Heizer would never be repaid. The Court of Appeals has already modified the debt aspect of the loans by requiring that the time of repayment depend upon IDC's income. *See Gilbert v. Commissioner*, 248 F.2d 399, 402 (2d Cir. 1957) ("classic debt" is "unqualified obligation to pay a sum certain . . . regardless of the debtor's income or lack thereof."). We will not further alter the debt aspects of the loans by subordinating Heizer to other creditors and by forcing Heizer to share in the risk that IDC will not be able to repay the loans.[23]

Our conclusion is not in contravention of the Court of Appeals' effort to unravel the transaction in an equitable manner. Heizer unfairly imposed the terms of the demand notes upon IDC. As relief from that conduct IDC must be permitted to repay on a schedule commensurate with its ability. As a consequence of its conduct, Heizer will have to wait longer for its money. But the remedy should extend no further. Both IDC and plaintiffs have fulminated against Heizer's proposed default by contending that Heizer has no right to a traditional loan agreement. We believe, however, that that is precisely what Heizer is entitled to, subject only to the qualification that the repayment schedule be subject to IDC's financial ability to make repayments. If Heizer had negotiated a traditional term note transaction with IDC in the first place, the Court of Appeals would not have ordered any relief. We believe that the relief commanded by the mandate encompasses no more than a reformation of the notes into traditional notes with the term determined by IDC's financial situation.[24]

Therefore Heizer is entitled to the traditional default provisions contained in Heizer Exhibit 22A: the right to declare upon default the unpaid balance and accrued interest of the loans due and payable and the right to proceed to collect the loans to the extent permitted by law and to collect reasonable expenses of collection. Default should be defined as (1) failure to pay principal when due; (2) failure for five days or more to pay interest when due; (3) breach of any covenant contained in the notes;[25] (4) any event of default under any other agreement; (5) breach of a lease which permits the lessor to reoccupy the leased premises or to repossess the leased equipment; (6) the institution of any proceeding in bankruptcy, insolvency, receivership, or reorganization or the making of any assignment for the benefit of credits; and (7) any failure for 60 days to pay any final judgment exceeding $25,000. These default provisions are fair and adequately protect Heizer.

Given our conclusion that Heizer is entitled to the protections afforded a traditional creditor holding term notes, additional terms are necessary to protect Heizer. Such terms would obviously be unnecessary and therefore lacking in demand notes, inasmuch as a default provision was implicit in the nature of the notes, and if IDC did anything to jeopardize Heizer's interests, it could call in the loans. When we modify this aspect of the demand loans, however, Heizer is entitled to some protection of its interest.[26] We find proposed terms 7–11 and 13, contained in Heizer Exhibit 22A to

---

**23.** Because we conclude that the mandate requires default provisions, we need not consider the tax consequences of a lack of default provisions. We do note, however, that the cases cited above for the proposition that debt must have default consequences would be relevant in a discussion of the availability of the deduction of interest. The deduction of interest payments is of obvious benefit to IDC.

**24.** When the Court of Appeals noted that "IDC will be able to pay back the loans eventually," we do not believe that it meant that Heizer would have to wait indefinitely, if necessary, but that it would probably not be necessary.

Rather the court intended that the terms of the notes be modified to provide for eventual repayment of Heizer.

**25.** *See infra.*

**26.** Affording this protection to Heizer does not allow it to perpetuate the unlawful nature of the demand notes, inasmuch as Heizer could not demand payment whenever it pleased or whenever it became concerned about IDC's financial condition. Instead the proposed terms would allow Heizer to demand payment only upon the occurrence of a specific event.

be reasonable.[27] These terms are designed to prevent IDC from dissipating cash projected to be available to repay Heizer and should not in any way hinder IDC's ability to meet the projections. Proposed term 12, which would prohibit IDC from executing leases which would cause rentals under all leases to exceed 12½% of total assets less current liabilities, excluding the current portion of long term debt, is unreasonable given IDC's current financial position. As IDC notes, Browning admitted that the lease of a typewriter would place IDC in default. Tr. 788. Thus we decline to add proposed term 12 to the notes.

One additional term that we must consider is the right to prepay. IDC's schedule provides a formula for determining whether any excess cash should be paid to Heizer. The formula, reflected in IDC's Exhibit 8, is designed to allow prepayment only if prepayment would not substantially adversely affect IDC. Heizer has criticized this formula because it leaves management the option of prepaying. Tr. 597. We believe, however, that we should permit IDC to determine, at least with respect to prepayment, what it can afford to pay. The mandate requires that payment be based on ability. Thus prepayment, which is in excess of our determination of that ability as reflected in the schedule, should be subject to management control. Moreover, as we understand IDC's definition of excess cash, management's discretion is to be guided by a determination of whether prepayment would impair IDC's needs for capital expenses. Thus the discretion is not unguided or capable of arbitrary application. In addition, IDC's proposed application of excess cash to the next year's payments, rather than the last year's payments, is preferable.

Finally, although the mandate requires us to impose default provisions on the notes, it does not empower us to create new "accrued interest" notes which would themselves accrue additional interest. Such relief would contravene the Court of Appeals' attempt to unravel the transactions in an equitable manner. Heizer wrongfully imposed the demand notes upon IDC, and the Court of Appeals accordingly ordered that repayment be determined on the basis of IDC's ability. IDC has been enjoined from paying interest. Modified Decree of March 19, 1978 ¶ 7. An order requiring IDC to pay interest on accrued interest would diminish the effect of the relief awarded by the Court of Appeals by softening the blow imposed by the extended payment schedule. Heizer's request for new interest bearing accrued interest notes is denied.

We finally come to the schedule of repayments. We have had to make several adjustments. First, although the schedule contemplated that repayment begin in 1978, it is now 1980. Nevertheless, we assume that IDC has retained the funds that it would have used to make the interest payments in 1978 and 1979.

The parties have submitted jointly a Stipulation which sets forth the amounts of interest which actually accrued during 1978 and 1979 and the correct amount of interest due for 1980 as well as the actual amount of "Beginning Cash" as of January 1, 1980. We have incorporated these known figures in the repayment schedule, though for 1981 and succeeding years, when the exact amounts are unknown, we have used the projections in the IDC Exhibit 1. Furthermore, we have subtracted from the operating income for 1979 the $145,000 in attorneys' fees that we awarded to petitioners in two separate orders in 1979, after the projections and schedules were prepared by IDC. We subtracted from the operating income for 1980 the additional $205,000 in attorneys' fees and costs that we have now awarded plaintiffs and petitioners.

---

27. The terms would prohibit IDC from 7) entering new businesses, 8) assuming additional long term debt, 9) issuing dividends, 10) allowing its subsidiaries to borrow money or issue securities, 11) making investments in other than its own subsidiaries, government obligations or in high grade commercial paper, and 13) merging with any other company or disposing of more than 5% of its assets in any one year.

We have adjusted the repayment schedule to reflect the reduction in preferred stock and cancellation of the 8% Senior Note which resulted from the exercise of warrants.[28] Should any remaining warrants be exercised by the holder of preferred stock, we direct the parties to make a further adjustment in the repayment schedule which will reflect the fact that additional funds will then be available in the year of warrant exercise for the repayment of debt. In that event, IDC should first apply such funds to pay its interest obligations accruing in the year of warrant exercise, next to provide for dividend and sinking fund payments in said year, if any are required, next to pay all remaining accrued interest and finally, when all of the above payments have been made, to pay the principal due on the debt.

Although we have decided that IDC is not required to obtain a working capital loan to finance receivables, IDC can, of course, choose to secure such a loan. Should IDC choose to secure a working capital loan and thereby make available cash which may, among other things, be used to discharge its obligations to Heizer, such funds should be applied in the same manner as set forth in the immediately preceding paragraph.

Under the terms of the repayment schedule, IDC is obligated to make current interest payments in amounts to be determined in accordance with changes in the prime rate. In order to conform IDC's repayment obligations to standard commercial instruments and practices in a manner consistent with our prior direction, the payments in the amounts of current and accrued interest due in any year (with adjustments for the prime rate changes) under the repayment schedule, shall be first credited against and shall be with respect to any unpaid accrued interest in reverse chronological order. Current interest not "paid" in such year because of the credit to accrued interest shall then become accrued interest. IDC shall still be obligated to make the payments set forth on the repayment schedule each year, but this "credit" to accrued interest shall not increase the likelihood of default or, in and of itself, cause a default, shall not require IDC to make greater payments in any year than those set forth in the repayment schedule and shall not increase the total amount owed by IDC to Heizer Corporation. Interest payments shall be made semi–annually at June 30 and December 31 and principal payments on December 31.

Finally, because a portion of the relief granted IDC is equitable in nature, the repayment schedule and related terms should be included as an Amendment to the Modified Decree entered March 17, 1978, as well as in the judgment order.

The schedule of repayments follows on the next page.

28. We have also adjusted the projected shareholder equity to reflect the liability for attorneys' fees and Heizer's exchange of preferred stock for common stock. *See* Appendices A and B.

## IDC SERVICES, INC.
### REPAYMENT SCHEDULE
(figures are expressed in thousands of dollars)

| | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash (1) | 1,682 | 1,291 | 1,776 | 1,321 | - | - | - | - | - | 1,347 | 3,796 | 6,450 | 9,330 | 26,993 |
| **Cash From Operations:** | | | | | | | | | | | | | | |
| Operating Income (2) | 2,750 | 3,570 | 4,190 | 4,609 | 5,072 | 5,579 | 6,137 | 6,750 | 7,425 | 8,169 | 8,985 | 9,884 | 10,872 | 83,992 |
| Federal Income Taxes | - | (1,491) | (1,081) | (2,011) | (2,249) | (2,509) | (2,795) | (3,108) | (3,453) | (3,863) | (4,363) | (4,915) | (5,429) | (37,987) |
| Discount @ 35% (3) | (963) | (728) | (837) | (909) | (988) | (1,075) | (1,170) | (1,275) | (1,390) | (1,507) | (1,618) | (1,739) | (1,905) | (16,104) |
| Non-Cash Funds | 427 | 460 | 475 | 450 | 450 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 5,462 |
| Capital Expenditures | (877) | (874) | (857) | (850) | (850) | (800) | (750) | (750) | (750) | (750) | (750) | (750) | (750) | (10,958) |
| Total | 1,337 | 937 | 1,170 | 1,289 | 1,435 | 1,595 | 1,822 | 2,017 | 2,232 | 2,449 | 2,654 | 2,880 | 3,188 | 25,005 |
| Cash Available For: | 3,019 | 2,228 | 2,946 | 2,610 | 1,435 | 1,595 | 1,822 | 2,017 | 2,232 | 3,796 | 6,450 | 9,330 | 12,518 | 51,998 |
| **Interest Payments** | | | | | | | | | | | | | | |
| Accrued at 12/31/78 (4) | (258) | | | (1,040) | (983) | (140) | | | | | | | | (2,421) |
| Prime + 2¼% Notes (5) | (1,198) | (350) | (350) | (350) | (350) | (350) | (257) | (120) | | | | | | (3,325) |
| 7¾% Notes (5) | (204) | (102) | (102) | (102) | (102) | (102) | (102) | (102) | (64) | | | | | (982) |
| 8% Senior Note (6) | (68) | | | | | | | | | | | | | (68) |
| Total | (1,728) | (452) | (452) | (1,492) | (1,485) | (592) | (359) | (222) | (64) | | | | | (6,796) |
| **Loan Principal Payments** | | | | | | | | | | | | | | |
| Prime + 2¼% Notes | | | | | | (1,003) | (1,463) | (1,296) | | | | | | (3,762) |
| 7¾% Notes | | | | | | | | (499) | (821) | | | | | (1,320) |
| 8% Senior Note (6) | | | | | | | | | | | | | | - |
| Total | | | | | | (1,003) | (1,463) | (1,795) | (821) | | | | | (5,082) |
| **Preferred Payments (Appendix B)** | | | | | | | | | | | | | | |
| 8.2% Dividends | | | (464) | (407) | | | | | | | | | | (871) |
| Sinking Fund | | | (709) | (711) | | | | | | | | | | (1,420) |
| Total | | | (1,173) | (1,118) | | | | | | | | | | (2,291) |
| Cash Remaining at Year-End | 1,291 | 1,776 | 1,321 | 301 | (not relevant after all preferred redeemed) | | | | 1,347 | 3,796 | 6,450 | 9,330 | 12,518 | 37,829 |
| Projected Shareholders' Equity at Year-End (Appendix A) | (1,189) | (94) | - | | | | | | | | | | | |

(1) The 1980 beginning cash figure in the IDC court-submitted Exhibit 1 has been adjusted to reflect the cumulative cash effect of 1978 and 1979 actuals.

(2) Operating income for 1980 as presented on IDC Exhibit 1 has been adjusted to reflect the final award by the Court of plaintiff's attorneys fees for an additional $205 thousand.

(3) A discount has been adjusted based on the adjusted operating income in footnote (2).

(4) Revised to reflect actual interest accrued through 12/31/78 versus the original projection.

(5) Interest payments for prime plus 2¼ and 7¾% notes have been adjusted to include actual interest accrued in 1979, now to be paid in 1980, in addition to actual interest obligations arising in 1980.

(6) Interest on the senior note has been adjusted to include accrued interest for January 1 through May 12, 1980. (Interest from May 12, 1980 through August 29, 1980 was included with the principal amount on the senior note for the purchase of common stock through the warrant exercised on August 29, 1980.)

## TERMS FOR ADJUSTED NOTES

| | | |
|---|---|---|
| 1. | Interest payment dates: | Semiannual—June 30 and December 31 |
| 2. | Principal payment dates: | Annual—December 31 |
| 3. | Optional prepayments without premium: | IDC may prepay the Term Notes at any time in whole or in part, without premium, at 100% of the principal amount thereof plus interest accrued to the date of prepayment. Any such prepayments shall be credited against future principal payments in chronological order of maturity. |
| 4. | Business requirements: | IDC and its subsidiaries shall engage only in the same businesses as those in which they are presently engaged. |
| 5. | Additional long term debt: | Not permitted except to prepay the Term Notes in full. |
| 6. | Dividends and stock re-acquisitions: | Dividends and reacquisitions of stock by IDC (other than dividends on and redemption of preferred stock owned by the holder of the Term Notes) are not permitted. |
| 7. | Subsidiaries: | Subsidiaries of IDC may not borrow money from, or issue securities to, any person other than IDC. |
| 8. | Restricted investments: | No investments by IDC or subsidiaries are permitted except investments in: (a) wholly owned subsidiaries of IDC; (b) U.S. government obligations maturing not later than one year from the date of investment; (c) open market commercial paper with a maturity not in excess of 270 days from the date of investment and having the highest credit rating given by Moody's Investors Services, Inc. or Standard & Poor's Corporation; and (d) certificates of deposit with a maturity not in excess of one year from the date of investment issued by any bank incorporated in the United States having a combined capital and surplus of at least $100 million. |
| 9. | Mergers, etc.: | Dispositions of more than 5% of total assets in any year, mergers, consolidations, and acquisitions of other businesses are prohibited. |
| 10. | Events of default: | Events of default are the following: |

(1) Failure to pay any principal when due;

(2) Failure, for five business days or more, to pay any interest when due;

(3) Breach of any covenant listed above;

(4) Any event of default under any other debt agreement;

(5) Any breach of any lease which permits the lessor to reoccupy the leased premises or to repossess the leased equipment;

(6) The institution of any proceeding in bankruptcy, insolvency, receivership, or reorganization or the making of any assignment for the benefit of creditors; and

(7) Any failure for 60 days to pay any final, enforceable judgment exceeding $25,000.

10. Events of default—
 Cont'd

TERMS FOR ADJUSTED NOTES—Continued

The events listed in (3) through (7) above apply to subsidiaries as well as to IDC.

If an event of default occurs, the holder of any of the Term Notes outstanding may declare the unpaid principal balance of the Term Notes and any accrued interest thereon immediately due and payable and may proceed to protect and enforce such holder's rights to the extent permitted by law. In such event, IDC will, to the extent permitted by law, pay to such holder such further amounts as shall be sufficient to pay the costs and expenses of collection, including reasonable counsel fees.

11. Application of certain
 interest payments:

In any year in which a payment of interest is made, that payment shall be applied first against, and shall be with respect to, any unpaid accrued interest in reverse chronological order and shall be applied second (after all accrued interest has been paid) against, and shall be with respect to, current interest then due. Current interest not paid in any year shall become accrued interest. This shall not constitute an event of default, shall not require IDC to make greater or different payments in any year than those in the repayment schedule, and shall not increase the total amount owed by IDC to Heizer Corporation.

## IDC SERVICES, INC.

### APPENDIX A—PROJECTED SHAREHOLDERS' EQUITY
(figures are expressed in thousands of dollars)

| | 12/31 1979 Actual | 1980 | 1981 | 1982 | 1983 |
|---|---|---|---|---|---|
| Preferred Stock ($.01 par value) | 3 | 2 | 1 | 1 | 1 |
| Less: (a) Surrendered for Common (Per Warrant Exercise) (1), (2) | (1) | (1) | — | — | — |
| (b) Redeemed for Cash (Per Sinking Fund Requirements) | — | — | — | — | (1) |
| Adjusted Total | 2 | 1 | 1 | 1 | — |
| Common Stock | 8 | 11 | 16 | 16 | 16 |
| Plus: Additional Common (Per Warrant Exercise) (1), (2) | 3 | 5 | — | — | — |
| Adjusted Total | 11 | 16 | 16 | 16 | 16 |
| Additional Paid-In Capital (Beginning) | 3,750 | 4,032 | 6,023 | 6,023 | 5,314 |
| (a) Adjusted for Purchase of Common Per Warrant Exercise (1), (2) | | | | | |
| —Increase for additional common | 1,191 | 2,661 | — | — | — |
| —Decrease for preferred surrendered | (909) | (670) | — | — | — |
| —Subtotal | 282 | 1,991 | — | — | — |

| | | | | | |
|---|---|---|---|---|---|
| (b) Adjusted for Preferred Redemption Per Sinking Fund Requirements | – | – | – | (709) | (710) |
| Adjusted Total (Ending) | 4,032 | 6,023 | 6,023 | 5,314 | 4,604 |
| Retained Earnings (Deficit) Beginning of Period | (8,757) | (8,085) | (7,179) | (6,134) | (5,331) |
| Less: Adjusted for Accrued Dividends Associated With Warrant Exercise [1], [2] | (284) | (256) | – | – | – |
| Add: Operating Income [3] | 1,763 | 2,750 | 3,570 | 4,190 | 4,609 |
| Less: 80% of 35% Discount [4] | – | (770) | (582) | (670) | (727) |
| Less: Interest Payments [5] | (807) | (818) | (452) | (452) | (452) |
| Less: Taxes | – | – | (1,491) | (1,801) | (2,011) |
| Less: Dividends on Preferred | – | – | – | (464) | (407) |
| Retained Earnings (Deficit) | (8,085) | (7,179) | (6,134) | (5,331) | (4,319) |
| Shareholders' Equity | (4,040) | (1,139) | (94) | – | 301 |

(1) On October 19, 1979 Heizer Corporation exercised its common stock purchase warrant for the purchase of 276,223 shares of IDC Services, Inc. common stock at $4.32 per share. In consideration of the total exercise amount of $1,193,283 Heizer Corporation surrendered 90,952 shares of preferred stock for $10.00 per share together with the right to receive the related accumulated dividends of $3.12 per share. The transaction has been reflected in Appendix A as follows:

| | Increase (Decrease) |
|---|---|
| Preferred stock surrendered—90,952 shares at $.01 par value per share | $ (910) |
| Common stock issued—276,223 shares at $.01 par value per share | $ 2,762 |
| Additional paid-in capital: | |
| • Applicable to common stock—276,223 shares at $4.32 per share less $.01 per share par value | $1,190,521 |
| • Applicable to preferred stock—90,952 shares at $10.00 per share less $.01 per share par value | (908,610) |
| | $ 281,911 |
| Accumulated deficit—90,952 shares of preferred stock at $3.12 per share | $ 283,763 |

(2) On August 29, 1980 Heizer Corporation exercised its common stock purchase warrant for the purchase of 555,555 shares of IDC Services, Inc., common stock at $4.80 per share. In consideration of the total exercise amount of $2,666,664 Heizer Corporation surrendered (a) senior note with a face value of $1,700,000 together with the right to receive related accrued interest $40,044 and (b) 67,039 shares of preferred stock for $10.00 per share together with a right to receive the related accumulated dividends of $4.82 per share. The transaction has been reflected in Appendix A as follows:

| | |
|---|---|
| Preferred stock surrendered—67,039 shares at $.01 par value per share | $ (670) |
| Common stock issued—555,555 shares at $.01 par value per share | $ 5,556 |
| Additional paid-in capital: | |
| • Applicable to common stock—555,555 shares at $4.80 per share less $.01 per share par value | $2,661,108 |
| • Applicable to preferred stock—67,039 shares at $10.00 per share less $.01 per share par value | (669,720) |
| | $1,991,388 |
| Accumulated deficit—67,039 shares of preferred stock at $3.82 per share | $ 256,230 |

(3) Operating income was reduced in 1980 to reflect payment of attorney's fees awarded by the Court of $205,000.

(4) The discount was adjusted based on 35% of adjusted operating income (see note 3).

(5) Includes actual interest incurred for 1980.

Appendix B—PREFERRED STOCK REDEMPTION SCHEDULE *

| | 1982 | 1983 |
|---|---|---|
| Total Funds Permitted by Equity Limit | $ 1,173 | $ 1,419 |
| Current Dividend | 116 | 58 |
| Funds Available After Dividend Paid | $ 1,057 | $ 1,361 |
| Dividend Accumulated Per Share (1976–1981) [1] | $ 4.911 | $ 4.911 |
| Redemption Price | $ 14.911 | $ 14.911 |
| Number of Shares Outstanding (Beginning of Year) | 142,009 | 71,122 |
| Number of Shares Redeemed | 70,887 | 71,122 |
| Number of Shares Outstanding After Redemption | 71,122 | –0– |
| Principal | $ 709 | $ 711 |
| Dividend | $ 348 | $ 349 |
| Total Funds Used | $ 1,057 | $ 1,060 |

* Figures are expressed in thousands except for numbers of shares.

(1) Accrued dividends through 12/31/80 were $4.0913 per share. In 1981 current dividends on preferred outstanding are projected $116 thousand or $.82 per share. Therefore accrued dividends through 12/31/81 are projected at $4.911 per share.

---

Plaintiffs are directed to submit an appropriate judgment order.